**Marshall Toney NAVE, et al.**

v.

**Phyllis Grindstaff NAVE.**

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Oct. 25, 2004 Session.

March 29, 2005.

Permission to Appeal Denied by Supreme Court Oct. 17, 2005.

---

David S. Haynes, Bristol, Tennessee, for the appellant, Phyllis Grindstaff Nave.

Arthur M. Fowler, III, Johnson City, Tennessee, for the appellee, Marshall Toney Nave, filed on his behalf by Terri Nave King, Conservator.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY and SHARON G. LEE, JJ., joined.

In this annulment action, Terri Nave King ("the Conservator") filed a petition to annul the marriage of her ward—her father, Marshall Toney Nave ("Husband")—to Phyllis Grindstaff Nave ("Wife"), on the ground that Husband was mentally incapable of entering into a marriage contract at the time of the wedding ceremony. After a two-day trial, the court below took the case under advisement. Before the court rendered its decision, Husband died. Subsequently, the court entered an order, finding that Husband's mental incapacity was a proper ground for annulling his marriage to Wife; the order was entered *nunc pro tunc* to the date of the final day of the trial, which had taken place some three months prior to Husband's death. Wife appeals, arguing, *inter alia*, that the Conservator lacked the authority to file an annulment petition on Husband's behalf; that the trial court erred in entering its order *nunc pro tunc;* that the Conservator is judicially estopped from filing an action for annulment; and that the evidence preponderates against the trial court's finding of mental incapacity. We affirm.

I.

Husband suffered a stroke in 1988, causing, according to his physician, "significant damage to a big part of the right side of his brain." The stroke severely affected Husband's mental and physical condition. While Husband could recall some past events, he had no short-term memory. He lost some control over his left arm and hand; he dragged his left leg; and he lost the ability to speak clearly. Physical therapy did little to improve his condition. Husband's physician stated that, following his 1988 stroke, he suffered several "ministrokes."

In January, 1996, Husband's first wife died. Following her death, Husband's condition worsened. Shortly after losing his wife, Husband moved in with the Conservator, as he had lost the ability to dress and feed himself, and he was no longer able to control his bowels or bladder.

Husband began "seeing" Wife in December, 1996, after running into her at a Christmas function. The two had known each other for over 30 years, since Wife was 14 or 15 years old; as of Christmas, 1996, Husband was 68 and Wife was 51.

Sometime in late 1997, Husband's vehicle was confiscated by the Tennessee Department of Safety. Since Husband was no longer able to drive, the Conservator hired Wife to act as Husband's chauffeur. During 1998, Husband began spending the night at Wife's house, and the two later began living together, though Husband would return to the Conservator's home

for days or weeks at a time when Husband and Wife had disagreements.

In the summer of 1998, Husband's physician diagnosed Husband with dementia related to his many strokes. Husband could not follow simple commands, such as "show your teeth" or "touch your nose." A few months later, the physician noted that Husband had suffered damage to both sides of his brain, which, according to the physician, reduced Husband to mere "rudimentary functioning." As of March, 1999, Husband could not tell his physician the correct day of the week, the month, or the current year.

Husband's condition continued to deteriorate over the next few months, to the point that his physician stated that his "vocabulary consisted only of a few words." In November, 1999, the physician executed a sworn Medical Examination Report in compliance with the requirements of Tenn.Code Ann. § 34–3–105(c) (2001), in which he recommended that certain rights of Husband be transferred to a conservator. On December 9, 1999, the Conservator filed a petition seeking to become her father's conservator. The Conservator had previously informed Wife that she intended to file the petition; Wife expressed to the Conservator her displeasure with this decision. On December 13, 1999—just four days after the petition was filed—Husband and Wife were married at the Carter County Courthouse, in the presence of Husband's adopted son, Beau Nave. The Conservator was not present at the wedding and was unaware that the parties intended to wed. The County Executive, who performed the marriage ceremony, thought Husband's mental state was good at the time of the wedding, though he admitted at trial that Husband's signature on the marriage license did not appear to be Husband's name. The County Executive further testified that he found it odd that Husband spoke of his deceased wife just prior to the ceremony.

Wife's characterization of Husband's condition is in sharp contrast to that of the Conservator and Husband's physician. Wife contends that Husband's physical and mental condition on the day of their wedding was good, that Husband was upset that the Conservator had filed her petition, and that Husband had told the Conservator that he was going to marry Wife. The Conservator, however, denies that Husband told her about the marriage. Instead, the Conservator contends that, when she confronted him about marrying Wife, Husband responded, "Hell no, I did not marry [Wife]." Wife further asserts that Husband ratified the marriage by engaging in sexual intercourse with her on their wedding night and three or four times a week thereafter. According to Wife, the couple last had intercourse in May, 2001. In June, 2001, Husband moved back into the Conservator's home, where he remained until September, 2003, at which time he was admitted to a nursing home.

On September 25, 2000, some nine months after the marriage of Husband and Wife, the trial court granted the Conservator's petition. The court's order transferred the following rights of the Husband to the Conservator:

The right to dispose of property;

The right to execute instruments;

The right to make purchases;

The right to enter into contractual relationships;

The right to give or refuse consent to medical and mental examinations and treatment or hospitalization;

The right to manage the property of [Husband], including the right to make investment decisions concerning said property and the right to make decisions

as to the management of the assets, income or expenses of [Husband];

The right to fully supervise and assist the person of [Husband];

The right to make decisions as to whether [Husband] should reside in a nursing home or in an assisted living situation and where he should reside; and

The right to do any other act of legal significance which the Court, at any time in the future, might deem necessary or advisable.

(Lettering in original omitted). On October 22, 2002, the Conservator filed in the trial court a petition to annul the marriage of Husband and Wife. Due to Husband's declining health, the Conservator filed a motion for an expedited trial, which motion was granted. The annulment petition was heard on October 29 and 30, 2003. At the conclusion of the trial, the court took the case under advisement. Three months later, on January 29, 2004, Husband died. The following day, the trial court entered an order annulling the marriage of Husband and Wife, in which the court stated the following:

This cause has been under advisement by the Court for an extended period of time, due to a variety of circumstances. The Court finds that [Husband] did not have the capacity to consent to marriage, nor did he ratify the marriage by his post-nuptial conduct.

Following the entry of this order, Wife filed a motion to alter or amend the trial court's judgment, contending that the annulment petition abated upon Husband's death. The Conservator filed a motion seeking to add *nunc pro tunc* to the court's order.

On March 18, 2004, the trial court filed its memorandum opinion, in which it detailed its findings of fact and conclusions of law with respect to the judgment annulling the marriage. The next day, the court entered an order in which it stated as follows:

The legal issues that have resulted because the Court did not enter its Order (entered 1/30/04) before [Husband's] death (1/29/04) were the singular product of this Court. Neither the parties, nor their counsel, contributed in any way to the Court's delay in the entry of its Order. The Court deeply and personally regrets that the time-consuming process of reaching a decision in this cause (as well as other work the Court was performing, in addition to personal matters that demanded this writer's attention) would subvert the rendering of justice in this cause. A gross miscarriage of justice would occur if the Court's lack of timeliness caused its Order entered January 30, 2004 to be declared "null and void", as [Wife] contends.

It is clear that true injustice would be done if the Court granted [Wife's] motions. [Wife's] motions are denied. [The Conservator's] motion is granted.

It is equally clear that truth, justice, and equity demand that the Court's Orders of January 30, 2004 and March 18, 2004 be entered nunc pro tunc, effective October 30, 2003 [the last day of the hearing].

IT IS SO ORDERED.

(Capitalization in original). From this order, Wife appeals.

## II.

As this is a non-jury case, our review is *de novo* upon the record of the proceedings below; but the record comes to us with a presumption of correctness as to the trial court's factual determinations that we must honor unless the evidence preponderates otherwise. Tenn. R.App. P. 13(d); *Wright v. City of Knoxville*, 898 S.W.2d

177, 181 (Tenn.1995); *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993). The trial court's conclusions of law, however, are accorded no such presumption. *Campbell v. Florida Steel Corp.,* 919 S.W.2d 26, 35 (Tenn.1996); *Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

## III.

Wife raises several issues for our consideration:

1. Did the trial court err in denying Wife's motion to dismiss the annulment petition on the basis that the Conservator lacked the authority to file and maintain the action?

2. Did the trial court err in denying Wife's motion to dismiss the annulment petition on the basis that the Conservator did not comply with the statute requiring verification of the complaint?

3. Did the trial court err in entering the annulment order *nunc pro tunc?*

4. Did the annulment action abate at the moment of Husband's death, which occurred while the trial court had the case under advisement?

5. Does the doctrine of judicial estoppel preclude the Conservator from pursuing the annulment petition, as she had previously filed a complaint for divorce on behalf of Husband?

6. Did the conservatorship terminate upon the death of Husband, thereby depriving the Conservator of standing to continue to pursue the annulment action?

7. Does the evidence preponderate against the trial court's findings of fact and conclusions of law, which were the

basis for the order annulling the marriage?

We will address each of these issues in turn.

## IV.

### A.

■ Wife first contends that the trial court erred in denying her motion to dismiss the annulment petition. She argues that the Conservator had no authority to file and maintain an action for annulment. In support of her argument, Wife relies upon Tenn.Code Ann. § 34–3–107(2) (2001),[1] which provides that an order appointing a conservator must enumerate those powers which are being transferred from the ward to the conservator, and that any power not specifically transferred remains with the ward. Because, so the argument goes, the order granting the Conservator's petition did not specifically vest her with the authority to file an annulment action on behalf of Husband, the Conservator had no authority to do so.

While the list of rights transferred to the Conservator does not expressly include the right to file suit, or, more specifically, the right to bring an annulment action, the order does give the Conservator the authority to "do any other act of legal significance which the [trial court], at any time in the future, might deem necessary or advisable." We hold that this "catch-all" provision includes the filing and maintaining of an annulment action, as such an action is clearly an "act of legal significance." Further, since the trial court allowed the Conservator to proceed with the petition and subsequently granted it, that court clearly believed it to be "necessary [and] advisable." Accordingly, we find that the order

---

1. In her brief before this court, Wife references Tenn.Code Ann. § 34–13–107. However, Chapter 13, entitled "Conservatorship Generally," was transferred to Chapter 3 of Title 34 in 2001.

designating Ms. King as conservator of Husband vested her with the right to file and maintain the petition for annulment.

In further support of her argument, Wife attempts to rely upon the case of *In re Buda*, 252 B.R. 125 (Bankr.E.D.Tenn. 2000). In that case, the bankruptcy court held that co-conservators could not file a petition in bankruptcy for their ward because the order of appointment did not "transfer ... authority to file a petition in bankruptcy." *Id.* at 133. We find that the holding in *In re Buda* is not implicated by the facts of the instant case. In the bankruptcy case, the order of appointment did not contain a provision similar to the "right to do any other act of legal significance" provision found in the instant case. For this reason, we do not find *In re Buda* to be persuasive authority with respect to the facts of this case.

### B.

 Next, Wife argues that the trial court erred in denying her motion to dismiss on her asserted basis that the Conservator did not comply with Tenn.Code Ann. § 36–4–107(a) (2001), which provides that a petition for divorce, unless brought on the ground of irreconcilable differences, must be verified by an affidavit that contains an oath affirming the veracity of the facts stated in the petition. We find that Wife cannot rely upon this statute as a basis for error. Wife's argument on this issue is premised upon the fact that § 36–4–107 is contained within chapter 4 of title 36, which chapter is entitled "Divorce and Annulment." We construe Wife's argument to be that any statute contained within this chapter is applicable to both divorce and annulment. Tenn.Code Ann. § 1–3–109 (2003), however, provides that section headings in the code "shall not be construed as part of the law." There is nothing in § 36–4–107 indicating that it is applicable to petitions for annulment. Moreover, statutes must be considered "in pari materia, not in a vacuum." *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn.1996). When § 36–4–107 is read in conjunction with § 36–4–106 (Supp.2004), it is clear that the "petition" referred to in the former statute relates only to a petition for divorce. Accordingly, we find this issue to be without merit.

### C.

 Wife next asserts that the trial court erred in entering the order granting the annulment petition *nunc pro tunc*. We disagree.

 This court, in *In re Estate of Lucas*, 844 S.W.2d 627, 629 (Tenn.Ct.App. 1992), noted the general rule in Tennessee that "a judgment rendered after the death of a party is void." However, the court went on to state an exception to this rule:

> Where a trial or hearing has already been held, and the case is under advisement when [the party] dies, judgment may be entered *nunc pro tunc*, or as of the preceding term. *See* 46 Am.Jur.2d *Judgments* § 101; *McLean v. State*, 55 Tenn. 22 (1873). In *McLean* the court said: "When the act[ ] was delayed for the convenience of the court, [it] [would] always take care that no party should suffer by such delay." [*Id.*] at [288].

*Id.* at 629–30.

When the court entered its order, it clearly stated that any delay in the entry of the order was not caused by any fault on the part of the parties; rather, the court put the onus of the delay upon itself, citing its workload and personal matters. The trial court was certainly concerned that "no party should suffer by [the] delay," *see McLean*, 55 Tenn. at 288, stating that "[a] gross miscarriage of justice would occur if the Court's lack of timeliness caused its Order entered January 30, 2004

to be declared 'null and void', as [Wife] contends." Under the exception pronounced in *Estate of Lucas*, the trial court acted well within its authority when it entered the judgment *nunc pro tunc* to October 30, 2003. We find no error in the court's decision to enter its order *nunc pro tunc.*

### D.

Wife contends that the annulment action abated upon the death of Husband, since the court had the case under advisement at that time and no final judgment had been entered. In light of our previous holding that the trial court properly entered the final judgment *nunc pro tunc* to October 30, 2003, this issue is rendered moot, as the final judgment was *effectively* entered prior to Husband's death on January 29, 2004.

### E.

■ Next, Wife argues that the doctrine of judicial estoppel[2] precludes the Conservator from pursuing the annulment petition, as the Conservator had previously filed a complaint for divorce on behalf of Husband. Wife contends that, by initially filing a complaint for divorce, the Conservator took a position inconsistent with the position taken in her later-filed petition for annulment, and that the law of judicial estoppel dictates that the annulment petition must be dismissed on that ground. We disagree.

■ Judicial estoppel is an equitable doctrine, designed to prevent a party from "gaining an unfair advantage" by making inconsistent statements on the same issue in different lawsuits. *Marcus v. Marcus,* 993 S.W.2d 596, 602 (Tenn.1999) (quoting *Carvell v. Bottoms,* 900 S.W.2d 23, 30 (Tenn.1995)). Judicial estoppel arises when a person makes a sworn statement in a judicial proceeding and then contradicts the statement in a subsequent proceeding. *Decatur County Bank v. Duck,* 969 S.W.2d 393, 397 (Tenn.Ct.App.1997). However, any statement "short of a willfully false statement of fact, in the sense of conscious and deliberate perjury, is insufficient to give rise to" judicial estoppel. *State v. Brown,* 937 S.W.2d 934, 936 (Tenn.Ct.App. 1996) (citation omitted).

In the instant case, the Conservator, on April 4, 2003, filed a complaint for divorce on behalf of Husband against Wife. In her complaint, the Conservator alleged that Wife was guilty of inappropriate marital conduct, or, in the alternative, irreconcilable differences. A few months later, before any discovery was taken in the case, the Conservator voluntarily dismissed the complaint. On October 22, 2002, the Conservator filed the petition to annul Husband's marriage to Wife, alleging that the marriage was voidable as Husband was mentally incapable of entering into such a marriage contract.

We hold there is no basis for the application of the doctrine of judicial estoppel in this case. In the complaint for divorce, the Conservator made no "willfully false statement[s] of fact." *See id.* Indeed, the Conservator "alleged facts in her [divorce] complaint which, if proven, would have en-

---

**2.** In her brief, Wife alludes to the doctrine of *equitable* estoppel. However, our review of her arguments in the brief, as well as the allegations in her pleadings before the trial court with respect to her estoppel argument, persuades us that the sole basis of Wife's argument with respect to estoppel is the Conservator's alleged inconsistent positions in fil-

ing a complaint for divorce and a subsequent petition for annulment. Call it what she will, this is nothing more than an argument on judicial estoppel; equitable estoppel is simply not implicated in any of Wife's filings in the trial court. *See Tamco Supply v. Pollard,* 37 S.W.3d 905, 909 (Tenn.Ct.App.2000).

titled [Husband] to [a divorce]." *See Woods v. Woods,* 638 S.W.2d 403, 406 (Tenn.Ct.App.1982). The Conservator did nothing to warrant the invoking of the defense of judicial estoppel.

## F.

Wife next asserts that the conservatorship terminated upon Husband's death, thereby depriving the Conservator of standing to continue to pursue the annulment action.

Wife did not raise this issue in the trial court. The law is well-established that issues not raised below cannot be raised for the first time on appeal. *Simpson v. Frontier Cmty. Credit Union,* 810 S.W.2d 147, 153 (Tenn.1991). However, assuming, purely for the sake of argument, that the issue was properly before the trial court, we have previously held that the trial court's order annulling the marriage was effective as of October 30, 2003, due to the *nunc pro tunc* order entered on March 19, 2004. Since the annulment was effective before Husband's death, his demise is of no consequence with respect to the issue of the Conservator's standing.

## G.

■ Finally, Wife contends that the evidence preponderates against the trial court's finding that Husband was mentally incapable of entering into a marriage contract. We disagree.

In its memorandum opinion and order, the trial court made the following findings of fact and conclusions of law:

At the time of the marriage ceremony, [Husband] suffered such mental defectiveness that he did not understand the marriage contract; therefore, he did not give his free and intelligent consent to the contract. At the time of the marriage, [Husband] did not have the mental capacity to understand the special

nature of a marriage contract, nor did he understand the rights, duties, and obligations which the marriage contract creates.

[Husband] never regained his competency; therefore he was incapable of ratifying the marriage. There is abundant clear and convincing evidence that, prior to the marriage ceremony, [Husband] was mentally incapable of consenting to or understanding the marriage contract. The various mental maladies and incapacitating conditions described by [Husband's physician] existed on the date of the marriage contract. [Husband's physician] was the only expert to testify as to [Husband's] mental and physical condition. [Wife] did not rebut [Husband's physician's] testimony. The Court believes [Husband's physician's] testimony. [Husband's physician] opined three (3) months before the marriage that [Husband] was incompetent to contract. Just minutes before the [County Executive] conducted the ceremony, [Husband] signed his name to the "Certificate of Marriage" as "Cary M. 7 Nc Nave". Exhibit 3. Just moments before the marriage, [Husband] did not know his name, nor was he able to sign his name. [Husband] did not ratify the marriage by sexual intercourse with [Wife] because he remained incompetent and "[ ] a lucid moment [for Husband] just really would not happen". [Wife] has failed to prove, by a preponderance of the evidence, that [Husband] ratified the marriage.

Conclusion

[Husband] was incompetent to enter into a marriage contract, did not understand the rights, duties, and responsibilities of marriage at the time of the marriage contract, nor did he subsequently ratify the marriage during a lucid moment.

IT IS, THEREFORE, ORDERED that the marriage of [Husband] and [Wife] is annulled, ab initio.

(Underlining and capitalization in original).

The evidence in the record overwhelmingly supports the trial court's findings with respect to Husband's mental incapacity to enter into a marriage contract. Wife introduced no expert proof to rebut the testimony of Husband's physician. Moreover, while Husband's adopted son, Beau Nave, attempted to convince the trial court that Husband's mental and physical condition was good at the time of the marriage, the trial court specifically found that "[Wife's] credibility is not good and Beau Nave's credibility is poor." As we have said many times, the trier of fact is in the best position to assess the credibility of witnesses; accordingly, such determinations are entitled to great weight on appeal. *Massengale v. Massengale,* 915 S.W.2d 818, 819 (Tenn.Ct.App.1995); *Bowman v. Bowman,* 836 S.W.2d 563, 567 (Tenn.Ct.App.1991).

We hold that the evidence does not preponderate against the trial court's findings of fact supporting its conclusion that Husband was mentally incapable of contracting to marry. Accordingly, we affirm the trial court's findings and holdings *in toto.*

## V.

The judgment of the chancery court is affirmed. This case is remanded for the enforcement of the trial court's judgment and for the collection of costs assessed below, all pursuant to applicable law. Costs on appeal are taxed to the appellant, Phyllis Grindstaff Nave.