# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
October 5, 2012 Session Heard at Athens[1]

### IN RE: ESTATE OF RAYMOND L. SMALLMAN

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Chancery Court for Hamblen County**
**Nos. 2009P120, 2009-440      Thomas R. Frierson, II, Chancellor**

---

**No. E2010-02344-SC-R11-CV - Filed February 26, 2013**

---

The primary issue we address in this appeal is whether certain evidence was erroneously admitted at trial and if so, whether it more probably than not affected the jury's verdict. This case arose out of the death of Raymond Smallman and the ensuing dispute between his two sons from a previous marriage and Linda Caraway, whom he married two weeks before his death. Mr. Smallman's sons challenged the validity of their father's marriage to Ms. Caraway and the validity of the lost will that Ms. Caraway sought to have established. Ms. Caraway claimed to be Mr. Smallman's surviving spouse and the sole beneficiary of his estate pursuant to the terms of his will. The case went to trial, and the jury was allowed to hear evidence about Ms. Caraway's real estate holdings and her late mother's will. The jury found in favor of Mr. Smallman's sons. The Court of Appeals affirmed. We granted Ms. Caraway permission to appeal to address whether Mr. Smallman's sons had standing to contest the validity of their father's second marriage and whether the introduction of evidence regarding Ms. Caraway's late mother's will and her real estate holdings was error and if so, whether it more probably than not affected the jury's verdict. We hold that Ms. Caraway waived her argument that Mr. Smallman's sons lacked standing to contest the validity of her marriage to their father. We further hold that the trial court erred in allowing into evidence testimony regarding Ms. Caraway's real property holdings and her late mother's will. Because this evidence more probably than not affected the jury's verdict, we reverse the judgment of the trial court and remand for a new trial.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals**
**Reversed; Cause Remanded**

---

[1] Oral argument was heard in this case in Athens, McMinn County, Tennessee, as part of this Court's S.C.A.L.E.S. (Supreme Court Advancing Legal Education for Students) project.

SHARON G. LEE, J., delivered the opinion of the Court, in which GARY R. WADE, C.J., JANICE M. HOLDER, and CORNELIA A. CLARK, JJ., joined. WILLIAM C. KOCH, JR., J., filed a separate opinion concurring in part and dissenting in part.

Donald Capparella, and Candi Henry, Nashville, Tennessee, for the appellant, Linda Caraway.

Douglas T. Jenkins, Rogersville, Tennessee; W. Lewis Jenkins, Jr., Dyersburg, Tennessee; and Denise Terry Stapleton, Morristown, Tennessee, for the appellees, Mark Smallman and Jeffrey Smallman.

**OPINION**

I. Facts and Procedural History

Raymond Smallman's first wife, with whom he had two sons, Mark and Jeffrey,[2] died in 2004. In 2006, Mr. Smallman, age sixty-nine, met the defendant, Linda Caraway, age fifty-nine, when she visited his pawn shop in Morristown. They began dating and decided to marry, planning a June 2008 wedding, although they did not publicly announce their marriage plans. In Spring 2008, Mr. Smallman was diagnosed with inoperable lung cancer. The wedding plans were cancelled, and Mr. Smallman underwent chemotherapy and radiation treatments. In 2009, he underwent a second round of chemotherapy. Treatments were not successful, however, and his health rapidly declined. In April 2009, Mr. Smallman executed a will at his attorney's office. Ms. Caraway moved into Mr. Smallman's residence in May 2009 and took care of him as his health worsened. On June 24, 2009, they were married at Mr. Smallman's home. Neither Ms. Caraway nor Mr. Smallman told anyone about the wedding. Thirteen days after the wedding, on July 7, 2009, Mr. Smallman died at his home. After his death, Mr. Smallman's sons learned that two months before his death, their father had executed a will naming Ms. Caraway as primary beneficiary of his estate, the value of which was estimated to be in excess of one million dollars.[3] The original will was never located after Mr. Smallman's death.

---

[2] Mark and Jeffrey Smallman are referred to individually by their first names to distinguish them from their father who is referred to as Mr. Smallman.

[3] The exact value of Mr. Smallman's estate is not apparent from the record. At trial, the court-appointed estate administrator presented an interim accounting showing the estimated value of assets passing under the will was approximately one million dollars; however, this amount did not include the value of several automobiles and other miscellaneous property.

On July 20, 2009, Mark Smallman filed a petition in Hamblen County Chancery Court, Probate Division, seeking to be named as Administrator of his father's estate and asserting that his father died without a will and was not married to Ms. Caraway at the time of his death. On July 30, 2009, Ms. Caraway, as Mr. Smallman's widow, filed a petition in the same court seeking to have Mr. Smallman's will admitted to probate. She attached a copy of the will and asserted that she had been denied access to Mr. Smallman's home to search for the original will. On September 4, 2009, the Smallman sons filed a complaint for declaratory judgment in the Hamblen County Chancery Court seeking to have their father's marriage to Ms. Caraway declared void and for a declaration that Mr. Smallman died intestate. The complaint also asserted that Mr. Smallman's will was not valid due to Ms. Caraway's undue influence and fraud and Mr. Smallman's lack of testamentary capacity when the purported will was executed. Ms. Caraway answered and requested that the complaint be dismissed.

At the outset of trial, the trial court addressed a motion in limine filed by Ms. Caraway requesting that the Smallman sons be prohibited from introducing (1) any evidence regarding Ms. Caraway's financial condition, including any information as to her real estate holdings, or (2) any evidence regarding the will of Ms. Caraway's late mother, Rena Blair, ("the Blair will") because the evidence would be prejudicial and irrelevant to the issues in the case. The trial court took the matter under advisement and later ruled that the evidence regarding both the Blair will and Ms. Caraway's real property holdings was admissible.

The issues before the jury included whether Mr. Smallman's will was void based on his lack of testamentary capacity and whether the will was obtained through the undue influence of Ms. Caraway; whether the lost will should be established and admitted to probate; and whether the marriage was valid based on Mr. Smallman's mental capacity. At trial, Ms. Caraway testified on her own behalf and called as witnesses James Gose, Ross Carmack, Betty Collins, Bill Foutch, John Brice, Clinton Anderson, Sandra Hardy, and Beth Boniface.

Ms. Caraway, who was widowed in 1999, testified that she first met Mr. Smallman through a mutual friend at Mr. Smallman's pawn shop in the summer of 2006. After their meeting, he called her the next day and began pursuing her. He came by her place of business, called her, and left notes on her car expressing his fondness for her. On their first date, Mr. Smallman told her that he "was looking for somebody to spend his life with and that it was me." But at that time, she was involved in pursuing the ministry and was not interested in marriage. However, they enjoyed each other's company and started spending a lot of time together. By the next year, she agreed to marry him, and they planned a June 2008 wedding. Although they did not announce their marriage plans, Mr. Smallman bought wedding rings in December 2007.

In March or April 2008, Mr. Smallman was diagnosed with inoperable lung cancer, and the June 2008 wedding was cancelled. Mr. Smallman underwent chemotherapy and radiation treatments. In 2009, Mr. Smallman underwent a second round of unsuccessful chemotherapy. His health rapidly declined.

In April 2009, Mr. Smallman had Ms. Caraway make an appointment for him with attorney Clinton Anderson to discuss executing a will and some other matters. On April 16, 2009, she drove Mr. Smallman to Mr. Anderson's law office and waited in the office vestibule while he and Mr. Anderson talked. Afterward, Mr. Anderson's secretary placed the will in an envelope bearing Mr. Smallman's name and the designation "Last Will and Testament." When Mr. Smallman came out of Mr. Anderson's office, he held a white envelope and asked her if she wanted to see what he had done with his will. When she declined, he sealed the envelope and put it back in the folder.

Ms. Caraway moved into Mr. Smallman's residence in May 2009 and took care of him as his health worsened. She ran errands, took money back and forth from the pawn shop, fixed his meals, washed his clothes, helped him to the bathroom when he could no longer get out of bed unassisted, and took him to his doctor's appointments. She and Mr. Smallman discussed marriage "all the time" while she was taking care of him. One morning after she had slept on the floor by his bed and was cleaning Mr. Smallman up after a bout with diarrhea, he said, "I am so sorry to put you through this." She assured him he was not putting her through anything and asked him if she could do anything else for him. He replied, "You can marry me," and his eyes were "begging." She agreed they would be married the following weekend because she "wanted to do whatever he asked."

Mr. Smallman directed Ms. Caraway regarding the wedding arrangements. He told her to call his cousin, Betty Collins, and invite her to attend the wedding. Mr. Smallman told her not to call his pastor, Ken Cole, to perform the ceremony because Reverend Cole's wife was ill and, instead, to call Mr. Smallman's friend and business acquaintance, Ross Carmack, an ordained minister. On June 22, 2009, Ms. Caraway secured and completed an affidavit from the Hamblen County clerk's office for Mr. Smallman to sign for the purpose of obtaining a marriage license. She then called Bill Foutch, an attorney who had done real estate work for Mr. Smallman, and he came to Mr. Smallman's residence and notarized Mr. Smallman's signature on the affidavit.

The wedding occurred on June 24, 2009. Ms. Caraway testified that only she, Mr. Smallman, Ms. Collins, and Mr. Carmack and his wife were present at the marriage ceremony. She stated that she loved Mr. Smallman, that he loved her, and that he knew what he was doing when he married her. She also stated that Mr. Smallman "knew what he was doing" up until the time of his death and knew who his family and friends were. Ms.

Caraway confirmed that a medical record of Mr. Smallman dated March 30, 2009, stated that Mr. Smallman was "alert" at that time and that his "mentation [was] good" and that another medical record dated May 26, 2009, described Mr. Smallman's "neurological mentation" as "normal."

Ms. Caraway was the only person with Mr. Smallman when he died on July 7, 2009. On the day of Mr. Smallman's death, she saw the envelope containing the will on a bookcase in the room where he died. She maintained that she had never asked Mr. Smallman about the will and did not know its contents. Ms. Caraway stayed in Mr. Smallman's house for approximately thirty-six hours after he died and testified that when she left, she removed only her personal items.

Following Mr. Smallman's death, Ms. Caraway and Mr. Smallman's son, Mark, went to the funeral home to make arrangements. Ms. Caraway and Mark provided the funeral director with Mr Smallman's statistical information but she did not disclose the marriage. She did, however, ask the funeral director outside of Mark's presence if it was important that the death certificate correctly reflect Mr. Smallman's marital status. She testified that the day after Mr. Smallman's death, she told Jeffrey Smallman that she and his father had married, and Jeffrey said "good" and hugged her. On the Thursday following Mr. Smallman's death, Jeffrey angrily called her and told her that they had found a copy of the will, that it left everything to her, and that they would contest it.

On cross examination, Ms. Caraway was presented with a list of her real estate holdings and was questioned about them. The list contained twenty-six tracts of real property. She verified that the purchase prices, which ranged from $1,704.58 to $172,000, were correct. She was also questioned regarding the Blair will and the circumstances of its execution. She and her sister, who died four years before trial, were her mother Rena Blair's only children. Six weeks after her sister's death, Ms. Caraway, at her mother's request, took her to have a will made. Her mother, who was terminally ill, executed a will that left everything to Ms. Caraway and nothing to her sister's adopted child. Ms. Caraway testified that at that point, her mother did not execute the will to cut anyone out and that she was her mother's "only blood heir." Ms. Caraway testified that she did not tell her mother what to put in the will.

James Gose testified that he was business partners with Mr. Smallman and that they talked frequently and had discussed Ms. Caraway. Mr. Smallman told him that he had certain standards for a wife, and that she met those standards. Mr. Smallman told him that "he had finally found someone that he liked as well as his wife" and wanted to marry her. Mr. Gose visited Mr. Smallman frequently to discuss business matters. He met with Mr. Smallman four or five days before he died, and they discussed a problem with the rental

house they owned jointly. Mr. Smallman never told him about the marriage. According to Mr. Gose, Mr. Smallman never reached a point where he was mentally incompetent.

Ross Carmack, a self-employed insurance and financial services broker, testified he had a business and personal relationship with Mr. Smallman. They became acquainted in 2005, and he assisted Mr. Smallman in setting up fifteen annuities, which named five of his six grandchildren as beneficiaries. Mr. Carmack last did business with Mr. Smallman in the middle of May 2009. He stated that Mr. Smallman wanted to limit the amount of money the grandchildren received each year from their annuities so they would not spend it all at once or squander it. Mr. Smallman told Mr. Carmack that he was disappointed his sons did not come around as often as he thought they should after he became ill.

Mr. Carmack testified that he saw Ms. Caraway at Mr. Smallman's residence on a couple of occasions. During the eighteen months before the wedding, Mr. Smallman had discussed with Mr. Carmack his desire to marry Ms. Caraway. Mr. Smallman had told him that he had met a new "soul mate" and that she rejuvenated him and said "I need to marry her. I want to marry her." A few months before the wedding, Mr. Smallman had told him that he needed to marry Ms. Caraway so that she could receive benefits from his military service.

Although Mr. Smallman knew Mr. Carmack was a minister, Ms. Caraway was not aware of this fact. Mr. Carmack attested that Ms. Caraway called him and asked him to perform the marriage ceremony, advising him that their own pastor was out of town and unavailable, and Mr. Carmack agreed to do so. Before the wedding ceremony, Mr. Carmack met privately with Mr. Smallman to make sure he wanted to get married. Mr. Carmack said that Mr. Smallman looked down for a long time and said it was something he wanted to do. Mr. Carmack also asked Mr. Smallman if he had a will, and Mr. Smallman told him that he did and that he had things in order the way he wanted them. Although Mr. Carmack did not ask Mr. Smallman about the contents of the will, Mr. Smallman had previously told him time and time again that he wanted to take care of Ms. Caraway. Mr. Carmack attested that at the time of the wedding, although Mr. Smallman was in a hospital bed and his voice was weak, Mr. Smallman was very alert mentally and appeared to understand what he was doing. Mr. Carmack was confident that Mr. Smallman wanted to marry Ms. Caraway, consistent with what Mr. Smallman had told him three years previously. Mr. Carmack stated that the witnesses to the ceremony were himself, his wife, and Mr. Smallman's cousin, Betty Collins.

Betty Collins, Mr. Smallman's first cousin, testified that after his wife's death, Mr. Smallman told her he had found someone he could be close to and who could fill the empty place left by his wife. Mr. Smallman expressed a desire to take care of Ms. Caraway. He

wanted her to stop all the work she was doing so they could be together. As a witness to the wedding, she thought that Mr. Smallman wanted to marry Ms. Caraway and that although he was sick physically, he had not declined mentally. She believed that he knew what he was doing. Ms. Collins testified that Ms. Caraway was Mr. Smallman's primary caregiver in his last days.

Attorney Bill Foutch testified that he represented Mr. Smallman in a real estate matters beginning in March or April of 2008. He stated that in 2009, shortly before Mr. Smallman died, he discussed a business matter with Mr. Smallman and that Mr. Smallman seemed to understand what he was talking about. He attested that Ms. Caraway would bring items to him on behalf of Mr. Smallman, including, on one occasion, a check. In June, Mr. Foutch went to Mr. Smallman's residence regarding the affidavit for the marriage license and met privately with him. Mr. Smallman signed the affidavit in the presence of Mr. Foutch, and Mr. Foutch notarized it. Mr. Foutch testified that in his opinion Mr. Smallman knew what he was doing when he signed the affidavit, and he knew what he was doing when he married Ms. Caraway.

John T. Brice, an employee of SunTrust Investment Services, Inc., testified he first met Mr. Smallman in October or November 1996 in a professional capacity through his work at SunTrust. He had also purchased pocket knives from Mr. Smallman over the years. On April 15, 2009, Mr. Smallman changed an account from a joint account with his deceased father into an individual account. Mr. Brice thought that Mr. Smallman was competent when he made this account change. Mr. Smallman had an annuity account that named his sons as equal co-primary beneficiaries and from which approximately $160,000 to $165,000 was paid to his sons following Mr. Smallman's death.

Clinton Anderson, a Morristown attorney, testified that he handled legal matters for Mr. Smallman, including the preparation of his will. At Mr. Smallman's request, Mr. Anderson prepared a will for him on April 16, 2009. Mr. Anderson met privately with Mr. Smallman and asked him a number of questions to confirm that he was mentally competent to make a will. Mr. Smallman appeared to be very intelligent and business-like. Mr. Smallman told Mr. Anderson what he wanted included in his will. Mr. Anderson was worried that Mr. Smallman was not leaving anything to his sons, so he questioned him about his intentions. "I asked him why he wasn't leaving his sons anything, and he said he had already taken care of them with certificates of deposit[] and maybe accounts on which he had their names." After they talked, he prepared the will, printed it, and Mr. Smallman signed it in his presence and in the presence of Mr. Anderson's secretary, Sandra Hardy. Mr. Anderson paid attention to Mr. Smallman because he was very ill and because under the terms of the will, Ms. Caraway was the sole beneficiary and Mr. Smallman's sons were omitted. In Mr. Anderson's opinion, Mr. Smallman appeared very sensible, knew what he

was doing, and knew and understood the extent of his property. Mr. Anderson stated that after signing the will, Mr. Smallman called Ms. Caraway into the office, held her hand, and expressed to her that he appreciated all she had done for him and told her how much he cared about her, although he did not mention a will in her presence. Mr. Smallman then left the office with the will.

Mr. Anderson's secretary, Sandra Hardy, testified that she witnessed Mr. Smallman sign his will. At that time, he appeared to be competent, to understand what he was doing, to know about his property, and to know who his relatives were.

Finally, Attorney Beth Boniface testified that she was appointed by the court on August 6, 2009 to administer the estate. The next day, she met with one of the Smallman sons and Ms. Caraway at Mr. Smallman's home, and they looked for a will but could not find one. She made an inventory of Mr. Smallman's assets, which totaled over two million dollars; approximately one million dollars of the assets in annuities and investment accounts passed outside the estate.

The Smallman sons also presented the testimony of several witnesses. In addition to their own testimony, they called as witnesses Kenneth Cole, Bobby Darnell, Teresa Darnell, Roy Johnson, Peter Balzano, and Susie Smallman.

Kenneth Cole testified that he was Mr. Smallman's pastor at Holt's Baptist Church in Hamblen County. He had been acquainted with Mr. Smallman for eleven years but was not asked to perform Mr. Smallman and Ms. Caraway's marriage ceremony, although he would have been available to do so. He stated that Mr. Smallman appeared to have affection for Ms. Caraway, and she was frequently with him when he visited.

Bobby Darnell was a lifelong friend of Mr. Smallman. He testified that he visited Mr. Smallman occasionally, last saw him on June 23, 2009, and was not told of the wedding. At his last visit, Mr. Smallman was very weak and bedfast.

Bobby Darnell's wife, Teresa Darnell, testified that she was in Mr. Smallman's house the day before the marriage ceremony, that she sat with him for an hour and a half, and that he was in bad shape and was gasping for breath.

Roy Johnson testified that he had known Mr. Smallman since 2006, when he met him through Mr. Smallman's pawn shop. He stated that he had seen Mr. Smallman on a daily basis and had noticed that Mr. Smallman had declined both physically and mentally. He also noted that Mr. Smallman had stopped keeping up with his ledgers and books when he became ill.

Peter Balzano, a business partner with Mr. Smallman in the pawn shop, testified that Mr. Smallman was frail the last time he saw him, and he noticed a mental and physical decline. Mr. Balzano stated that Mr. Smallman had been very meticulous about the business and kept track of things, but not after he became ill. Mr. Balzano stated that after Mr. Smallman's first wife died, he was lonely and looking for companionship. Mr. Smallman enjoyed Ms. Caraway's company and became very fond of her, and he had talked about marrying her. However, he did not talk much about the marriage after he got really sick. As Mr. Smallman's illness progressed, Ms. Caraway's care of him increased. Mr. Balzano stated that when he saw Mr. Smallman three days before the marriage, Mr. Smallman was bedridden and it was a struggle for him to communicate. In Mr. Balzano's opinion, Mr. Smallman could not have participated in a marriage ceremony at that time. When Mr. Balzano called Mr. Smallman to see if he could visit him on June 24, 2009, Ms. Caraway advised him that they were expecting company from the church and that it would not be a good time because it would be too much for Mr. Smallman.

About ten days before Mr. Smallman died, Mr. Balzano asked Ms. Caraway if Mr. Smallman had a will, and she told him that there was one and that Mr. Balzano had been taken care of. She then scheduled an appointment for Mr. Balzano to talk with Mr. Anderson, who told him that there was a provision in the will that would take care of the partnership. The day after Mr. Smallman died, Mr. Balzano opened up the pawn shop business as a sole proprietorship with a new business tax license. He stated that he did so in order to continue to operate the business. Mr. Balzano stated that Ms. Caraway told him that she would have given the estate to the Smallman sons but that Jeffrey had chosen not to attend his father's funeral, therefore, she felt that she needed to proceed with her case.

Mark Smallman's wife, Susie Smallman, testified that Mr. Smallman was a private person. Mr. Smallman told her that Ms. Caraway did not want to get married because she did not want him to have her property and she did not want any of his. She stated that toward the end of Mr. Smallman's life, she and Mark were with him more frequently. She said that the last two or three weeks of his life, Mr. Smallman did not communicate a whole lot and was bedridden. She stated that on the morning after his marriage, Ms. Caraway called and said she thought he was getting worse and did not know whether she should request hospice care. Mrs. Smallman and Mark went over and talked with her about that option. Mrs. Smallman testified that Steve Smallman, Mr. Smallman's grandson who was in the Navy, came in town on June 29, 2009, and went to Mr. Smallman's house in his uniform. She attested that although Mr. Smallman recognized Steve, he never reached out or said very much to him. Mrs. Smallman knew that Mr. Smallman enjoyed Ms. Caraway's companionship and was appreciative of all that she did for him. Mrs. Smallman stated that she last saw her father-in-law on July 3, 2009, and Ms. Caraway was taking care of him at that time. After Mr. Smallman died, she heard Ms. Caraway tell Mark and Jeffrey that she

and Mr. Smallman had been married and that Ms. Caraway told them "We got married on paper only, to help Pete [Balzano]."

Mark Smallman testified that his father kept a detailed accounting in a ledger book and that in March 2009, the ledger book showed that Mr. Smallman had cash in the amount of $42,880. Mark noted, however, that the handwriting in the ledger book changed, especially in May 2009, and that the entries declined and eventually stopped. Mark stated that Mr. Smallman was a very private man. He knew that his father had a girlfriend, but it was not a public relationship. He attested that after Mr. Smallman got sick, Ms. Caraway started going to church with him and spending more time at his house. Mark said he saw Mr. Smallman about every other day around the time of his death. He visited him a day or two before the marriage and the day after, but neither his father nor Ms. Caraway mentioned the marriage. On the day after the marriage, he recalled that Ms. Caraway called him at 7:00 in the morning and said that she was worried about his father and could not take care of him any longer and that they would have to do something. Mark and his wife went over to his father's house and although they discussed getting a nurse to care for Mr. Smallman, Ms. Caraway ultimately decided that she was not in favor of hospice care. Mark stated that when he talked to his father on that day, Mr. Smallman was unable to speak in full sentences and although he knew who Mark was, he could not carry on a conversation.

Mark testified that after Mr. Smallman died, he and Ms. Caraway went to the funeral home to pick out a casket. In the meeting with the funeral director, Ms. Caraway never mentioned that there had been a marriage ceremony. However, the next day when Mark went back to the funeral home to take Mr. Smallman's military uniform, the funeral director advised him to look at the death certificate when he got it. Mark subsequently found out about the marriage through Jeffrey, not from Ms. Caraway, contrary to his wife's testimony.

Mark stated that before Mr. Smallman's death, he and Jeffrey had made an appointment with attorney Jimmy Davis to discuss taking over their father's property and that when they kept this appointment on the Thursday after Mr. Smallman died, they learned that their father had a will and that Ms. Caraway had a copy of it.

Mark admitted that Ms. Caraway took care of his father and moved into his house and stayed with him around the clock. He was upset with her because she married his father on his deathbed and that she wanted to take everything they had worked for. Mark attested that Ms. Caraway remained in his father's house until the day after his death and then moved all of her possessions out of the house. Mark did not find any cash or a coin collection in his father's home, nor did he find his father's will at the house. Mark testified that his father was very private. He had been unaware that Mr. Smallman had established annuities worth

approximately one million dollars for his grandchildren and an investment account with Mark and Jeffrey as beneficiaries.

Jeffrey Smallman was the final witness to testify. Jeffrey was employed as a civil engineer in Pennsylvania. He stated that he visited his father once a year for a week in the summer and talked to him by phone every other week. He testified that when he first met Ms. Caraway in April 2009, she told him that Mr. Smallman had wanted to marry her and she had declined. She said that Mr. Smallman had told her he had a lot of money and would give her a third of everything if she would marry him, but she told him that she did not want people around town talking that she had married an older man just for his money.

Jeffrey attested that by April 2009, Mr. Smallman had lost a lot of weight and was going downhill. When he returned at the end of May, his father had gotten worse and seemed confused about things. He stated that he spoke with his father by phone on Father's Day, June 21, 2009, and that his father seemed confused during that conversation.

Jeffrey had already applied for medical leave to visit his father beginning July 7, 2009, when early that morning he received a telephone call from Ms. Caraway informing him that his father had died. He drove to Morristown the next day. On the evening of his arrival, Mark told him that all of his dad's important paperwork, his savings account statements, tax returns, and things of that nature, were missing. Mark also told him that something "weird" had happened that day at the funeral home. Jeffrey called Ms. Caraway to come and meet with them. After her arrival, Ms Caraway advised that she did not know anything about missing paperwork or Mr. Smallman's business affairs. She admitted that she had taken Mr. Smallman to Mr. Anderson's office in April of that year to have a will prepared, but did not know whether Mr. Smallman had a will. During the conversation, she told them, "That's been bothering me, I don't like keeping secrets. Your dad and I are married. But we're just married on paper to save the pawn shop from the City of Morristown closing it. A surviving spouse can insist that the pawn shop stay open."

Jeffrey attested that the day after this conversation with Ms. Caraway, they learned that Mr. Smallman had a will dated April 16, 2009. Jeffrey was upset, and he felt betrayed and was angry with Ms. Caraway. He called her and told her there was a will, and it left everything to her. He attested that she said she told Mr. Smallman she did not want anything and that she would "sign anything denying your dad's estate. I don't want none of it." Jeffrey told her that if the original will was ever found, they would fight it. Jeffrey testified that he was so upset, he decided to leave and go home and not stay for the funeral.

At the close of proof, the jury returned a verdict in favor of the Smallman sons on all issues, specifically concluding that (1) the June 24, 2009 marriage between Mr. Smallman

-11-

and Ms. Caraway was not valid; (2) the lost will of April 16, 2009, should not be established and admitted to probate; (3) Mr. Smallman was not of sound mind when he executed the will of April 16, 2009; and (4) the will of April 16, 2009, was obtained through the undue influence of Ms. Caraway. The trial court entered judgment in accordance with the jury's verdict, ruling the marriage between Mr. Smallman and Ms. Caraway invalid, denying and dismissing Ms. Caraway's petition to admit the copy of the purported will of April 16, 2009, to probate, and ruling that the purported will of April 16, 2009, was obtained through the undue influence of Ms. Caraway, and that Mr. Smallman was not of sound mind at the time of its execution.

Ms. Caraway appealed. The Court of Appeals ruled that admission of the evidence regarding the Blair will, and Ms. Caraway's real property holdings, was harmless error. The Court held that the jury's verdict was supported by material evidence and affirmed the judgment. *In re Estate of Smallman*, No. E2010-02344-COA-R3-CV, 2011 WL 6144365, at *12 (Tenn. Ct. App. Dec. 12, 2011). Judge Charles D. Susano, Jr., filed a dissenting opinion, concluding that the admission of the evidence of the Blair will and Ms. Caraway's real property holdings was harmful error and necessitated a new trial. *Id.* at *13-14 (Susano, J., dissenting). We granted Ms. Caraway permission to appeal.

## II. Analysis

Three issues are raised in this appeal: (1) whether the Smallman sons had standing to contest the validity of Ms. Caraway's marriage to Mr. Smallman; (2) whether the trial court abused its discretion in admitting evidence of the Blair will and Ms. Caraway's real estate holdings and if so, whether the admission of such evidence was harmful error warranting reversal and a new trial; and (3) whether there was material evidence to support the jury's verdict that Ms. Caraway's marriage to Mr. Smallman was void.

We begin with Ms. Caraway's contention that the Smallman sons did not have standing to challenge the validity of the marriage between herself and Mr. Smallman. This is an issue of law, and therefore our review is de novo. *Cox v. Shell Oil Co.*, 196 S.W.3d 747, 758 (Tenn. Ct. App. 2005).

The Smallman sons challenged the marriage by filing a complaint for declaratory judgment seeking a ruling that the marriage was void because Mr. Smallman lacked the legal ability to marry. Citing *Coulter v. Hendricks*, 918 S.W.2d 424, 426 (Tenn. Ct. App. 1995), Ms. Caraway argues on appeal that, at most, her marriage to Mr. Smallman was voidable, not void. She asserts that because the right to challenge the validity of the marriage belonged solely to herself and abated when Mr. Smallman died, the Smallman sons were without standing to challenge the marriage. Ms. Caraway, however, failed to raise the standing issue

in the trial court or the Court of Appeals. An issue not raised at trial may not be raised for the first time on appeal. *Correll v. E.I. DuPont de Nemours & Co.*, 207 S.W.3d 751, 757 (Tenn. 2006) (quoting *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991)); *see also* Tenn. R. App. P. 13(b). Accordingly, the issue is waived. We find no merit in Ms. Caraway's contention that she used the wrong label in raising the issue at trial and that she raised the issue by maintaining that the marriage was presumptively valid.

Ms. Caraway alternatively argues that the issue is not merely an issue of standing but is actually an issue of subject matter jurisdiction. Subject matter jurisdiction is non-waivable and must be considered by an appellate court. *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632, 639 (Tenn. 1996). Ms. Caraway, relying on *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), contends that the issue of standing and the issue of subject matter jurisdiction are "inexorably intertwined" in this case so that the issue of standing is not subject to waiver.

In *Osborn*, the mother of a child sought to terminate the father's parental rights based upon Tennessee Code Annotated section 36-1-113(g)(6), which allows parental rights to be terminated if the parent is imprisoned for at least ten years for commission of a crime and the child is less than eight years of age when sentence is entered. We dismissed the case because the mother did not have standing to seek termination of the father's parental rights. *Osborn*, 127 S.W.3d at 741. Citing *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002), we noted that a court may not terminate parental rights in this state absent specific statutory authority to do so. *Osborn*, 127 S.W.3d at 739. Subsection (b) of the termination statute at the time specifically listed those parties who have standing to terminate parental rights as "[t]he prospective adoptive parent(s) of the child, any licensed child-placing agency having custody of the child, the child's guardian ad litem, a court appointed special advocate (CASA) agency, [and] the department." *Id.* (quoting Tenn. Code Ann. § 36-1-113(b) (2001)). We determined that "[w]hen a statute creates a cause of action and designates who may bring an action, the issue of standing is interwoven with that of subject matter jurisdiction and becomes a jurisdictional prerequisite." *Osborn*, 127 S.W.3d at 740. We addressed the issue of standing even though it had not been raised below because of the statutory provisions controlling termination of parental rights. *Id.* Ms. Caraway's attempt to conflate standing and subject matter jurisdiction based on our holding in *Osborn* fails. In the case before us, there is neither a statute that creates a cause of action nor one that limits the parties who may bring such an action, and *Osborn* therefore is distinguishable and inapposite.

The second issue we address is whether the trial court abused its discretion in admitting evidence of the Blair will and Ms. Caraway's real estate holdings and if so,

whether the admission of such evidence was harmful error warranting reversal and a new trial.

Relevant evidence is admissible, and irrelevant evidence is not, unless excepted by the state and federal constitutions, the Tennessee Rules of Evidence, or other rules or laws generally applicable to the courts. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The admission of evidence is left to "the sound discretion of the trial judge," *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 442 (Tenn. 1992), and "[r]elevancy is always a judicial question to be determined according to the issue which is to be tried." *Randolph v. State*, 570 S.W.2d 869, 872 (Tenn Crim. App. 1978) (quoting *Ellison v. State*, 549 S.W.2d 691, 696 (Tenn. Crim. App. 1976)). We review a trial court's admission of evidence under an abuse of discretion standard and will reverse the decision to admit evidence only if "the court applied an incorrect legal standard, or reached a decision which is against logic or reasoning" and admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)) (internal quotation marks omitted).

First, we consider the propriety of admitting the Blair will as evidence in this case. The Blair will designated Ms. Caraway as the sole beneficiary of her mother's estate. When the will was executed, Ms. Caraway's only sibling was deceased, and the will left nothing to Ms. Caraway's deceased sibling's adopted son. At the beginning of trial, the Smallman sons' attorney argued that the Blair will was admissible as relevant evidence showing a common scheme or plan by Ms. Caraway "to be a primary beneficiary in testamentary documents." Ms. Caraway's attorney objected to admission of the Blair will because it was not relevant and would merely show that Ms. Caraway inherited property from her mother. Counsel for the Smallman sons represented to the trial court that they would prove that Ms. Caraway was instrumental in having the will made and that other family members were excluded to her betterment. The trial court admitted the Blair will into evidence. The Smallman sons now contend that they proved through Ms. Caraway's testimony that at her mother's request, she took her mother to an attorney for that purpose, that her mother was terminally ill at the time, and that under the revised will, Ms. Caraway received all of her mother's estate and her deceased sibling's adopted child received nothing. The Smallman sons argue that these facts constitute "suspicious circumstances" which parallel the facts in the present matter. These facts, according to the Smallman sons, show a common scheme by Ms. Caraway to exert undue influence in the testamentary matters of a terminally ill person to her benefit and to the exclusion of others who would have been natural objects of such person's bounty. We disagree.

-14-

To support their position, the Smallman sons rely on *Keith v. Murfreesboro Livestock Market, Inc.*, 780 S.W.2d 751 (Tenn. Ct. App. 1989) wherein the Court of Appeals observed that, as a general rule, a case should be decided only upon the evidence specifically applicable to it, and a trial court should not admit evidence of an extrinsic transaction having no connection with the transaction giving rise to suit. *Id.* at 756. The court, however, acknowledged exceptions to this general rule, noting that "[e]vidence concerning unrelated transactions may be used to show matters such as knowledge, absence of mistake or accident, fraudulent intent, or *the existence of a common scheme or plan.*" *Id.* at 757 (emphasis added). The court ruled that when a party seeks to introduce evidence of extrinsic acts, it must show more than that there are some elements that the acts have in common, but rather, that there is substantial similarity. *Id.* There must be "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." II John H. Wigmore, *Evidence* § 304 (Chadbourne rev. 1979) at 249 (emphasis omitted); *see also Armstrong v. Bowman*, 115 S.W.2d 229, 234 (Tenn. Ct. App. 1937) ("Ordinarily collateral contracts are not relevant, but, where *substantial similarity* of conditions exist, the testimony becomes relevant and is admissible for what it is worth.") (emphasis added).

Under cross-examination, Ms. Caraway testified that her only sister, who died four years before trial, had one child — an adopted son. Six weeks after her sister died, Ms. Caraway, at her mother's request, took her to an attorney to have her will made. Her mother executed a will, leaving all of her estate to Ms. Caraway and nothing to her adopted grandchild. Ms. Caraway testified she did not tell her mother what to put in the will. The Smallman sons contend that Ms. Caraway was engaged in a common scheme to unduly influence both her mother and Mr. Smallman in the executions of their wills. However, there is not a substantial similarity between the Blair and Smallman wills. The only similarities are that each testator was suffering from a terminal illness at the time of execution, that Ms. Caraway transported each testator to an attorney for the execution, that each testator was close to Ms. Caraway, and that Ms. Caraway was the sole beneficiary under each will. The testamentary exclusion of an adopted grandson does not equate to the exclusion of two biological sons; it is not suspicious that Ms. Caraway's mother left her entire estate to her only living child, and, in any event, there is nothing in Ms. Caraway's testimony from which it could be reasonably inferred that she unduly influenced her mother in the execution of her will. The mere fact that Ms. Caraway assisted both her mother and Mr. Smallman during their illnesses by taking them to an attorney so that they might execute their wills does not, without more, show a common scheme or plan to unduly influence either testator. Rather, the reasonable inference arising from this fact is that Ms. Caraway took her mother and Mr. Smallman to their respective attorneys because their debilitated conditions prevented them from acting without her help. In sum, Ms. Caraway's testimony fails to present a concurrence of common features between the circumstances surrounding the execution of

-15-

the wills of her mother and Mr. Smallman. Consequently, the trial court erred in admitting and allowing the jury to consider the irrelevant evidence regarding the Blair will.

Next, we address whether the trial court erred in admitting evidence regarding Ms. Caraway's real property holdings. In their pretrial exhibit list, the Smallman sons included "[a]ll deeds and wills wherein Linda Caraway has gained property." In response, Ms. Caraway filed a motion in limine requesting that the trial court prohibit the Smallman sons from introducing any evidence concerning her financial condition, including but not limited to her real estate holdings, because the evidence was irrelevant and prejudicial. The trial court denied Ms. Caraway's motion and permitted the Smallman sons to introduce evidence concerning Ms. Caraway's real estate holdings.

At trial, the Smallman sons introduced and questioned Ms. Caraway about a two-page list provided by her in response to interrogatories showing twenty-six pieces of real property with a purchase price assigned to all but two, reflecting a total purchase price of $1,812,155.

As a general matter, evidence of a party's financial condition is irrelevant and therefore inadmissible at trial.[4] The rights and liabilities of the parties should be adjudged on the basis of their past conduct and legal relationship rather than their financial conditions. Evidence of a party's financial condition is usually not admissible because it may create a risk that a jury will ground its decision on prejudice or sympathy and not on the merits of the case. *See Herstein v. Kemker*, 94 S.W.2d 76, 94 (Tenn. Ct. App. 1936); 2 Clifford S. Fishman, *Jones on Evidence*, § 13:25, at 522 (7th ed. 1994). There are exceptions to this general rule of inadmissibility. For instance, evidence of a defendant's financial condition is relevant and admissible in assessing punitive damages. *Odom v. Gray*, 508 S.W.2d 526, 533 (Tenn. 1974). But evidence of the defendant's financial condition is only admissible in the bifurcated phase of the trial devoted to determining the amount of punitive damages. *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992). During the phase of the trial pertaining to liability or the amount of compensatory damages, proof of the defendant's "financial affairs, financial condition, or net worth is not admissible." *Id.*; *see also Emerson v. Oak Ridge Research, Inc.*, 187 S.W.3d 364, 373 (Tenn. Ct. App. 2005).

Another exception to the rule also exists in the context of a will contest when such evidence is determined to be relevant and admissible in deciding whether a will is just and

---

[4] We are not presented with the question of whether information regarding Ms. Caraway's financial status was properly subject to discovery in this case. "[D]iscoverability and admissibility at trial are separate matters," *Wilson v. State*, 367 S.W.3d 229, 236 (Tenn. 2012), and inadmissible evidence may be discoverable if it "appears reasonably calculated to lead to the discovery of admissible evidence." Tenn. R. Civ. P. 26.02(1); *Thomas v. Oldfield*, 279 S.W.3d 259, 262 (Tenn. 2009).

equitable as related to the question of fraud and undue influence. For example, evidence that a natural heir excluded as a beneficiary was wealthy when the testator executed his or her will constitutes circumstantial evidence relevant in showing that the testamentary disposition was not suspicious and therefore less likely to have been the result of undue influence. *Estes v. Perkins*, 238 S.E.2d 423, 424 (Ga. 1977); *see also* 2 Clifford S. Fishman, *Jones on Evidence*, § 13:25, at 524 (7th ed. 1994). On the other hand, "evidence of the financial condition of persons who would not benefit from a finding of undue influence is properly excluded." 95 C.J.S. *Wills* § 392 (2011); *see also McGahee v. Phillips*, 84 S.E.2d 19, 21 (Ga. 1954) (finding that trial court properly denied admission of evidence of mother's and sister's financial circumstances where if probate of will were denied on grounds of undue influence, mother and sister would receive no benefit). Ms. Caraway would not have benefitted from a finding that Mr. Smallman's will leaving everything to her was the result of her undue influence; evidence of her financial condition was irrelevant to the issues in this case and was improperly admitted.

Having concluded that the trial court erred in admitting evidence related to the Blair will and Ms. Caraway's real property holdings, we must now determine whether the admission was harmful and therefore, grounds for reversal. When evidence is improperly admitted by the trial court, reversal is only called for if the error affected the results of the trial—"[w]hether it is sufficiently prejudicial to require reversal depends on the substance of the evidence, its relation to the other evidence, and the peculiar facts and circumstances of the case." *Keith*, 780 S.W.2d at 758 (citing *Wheeler v. State*, 539 S.W.2d 812, 814 (Tenn. Crim. App. 1976)). Errors in the admission of evidence are harmful and call for reversal when "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." *State v. Gomez*, 367 S.W.3d 237, 249 (Tenn. 2012) (quoting Tenn. R. App. P. 36(b))[5]; *see also Flax v. DaimlerChrysler Corp.*, 272 S.W.3d 521, 543 (Tenn. 2008).

In conducting a harmless error analysis in a jury case, it is incumbent upon the reviewing court to carefully examine the whole record in determining whether admission of the evidence more probably than not influenced the jury's verdict.[6] The reviewing court

---

[5] Tennessee Rule of Appellate Procedure 36(b) provides in pertinent part that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."

[6] In response to the suggestion that it is not possible to exactly ascertain what the members of a jury were thinking when they rendered their verdict, one oft-cited legal treatise comments as follows:

(continued...)

should consider the substance of the wrongly admitted evidence and its relation to other evidence in the case in the context of the case's peculiar facts and circumstances. *Blankenship v. State*, 410 S.W.2d 159, 161 (Tenn. 1966). While it should not be presumed that the jury members were influenced by passion and prejudice as a result of the inadmissible evidence, "it is presumed that the jury considered whatever evidence was laid before them." *Hager v. Hager*, 66 S.W.2d 250, 257 (Tenn. Ct. App. 1933). In assessing the amount of weight a juror probably would have placed on the erroneously admitted evidence, the reviewing court should take into account whether the facts present a close case or whether the point at issue is not clearly established by the proof. *Id.* A finding of either supports the conclusion that introduction of the evidence was harmful error. *Id.* The court should also bear in mind that the mere fact that there is sufficient evidence in the record to support the jury's verdict does not necessarily render the admission of wrongfully admitted evidence harmless as it cannot be known what weight the jury assigned to the inadmissible evidence in reaching its verdict. *Blankenship*, 410 S.W.2d at 161. If the reviewing court determines, however, that the fact the inadmissible evidence was submitted to establish is clearly established by other evidence in the case that is competent and properly admitted, the court ordinarily should hold the error harmless. *Love v. Smith*, 566 S.W.2d 876, 879 (Tenn. 1978). Further, the reviewing court should examine the degree to which the wrongly admitted evidence was emphasized by its proponent during trial as an indicator of its likely prominence in the minds of the jurors, noting in this regard whether the evidence was mentioned by counsel in opening statement or closing argument. *Cf. State v. Young*, 196 S.W.3d 85, 107 (Tenn. 2006). The reviewing court should not focus on whether other evidence supported the jury's verdict and whether the jury reached a correct result. Rather, implementing the considerations we have here described and any other appropriate considerations indicated by the specific facts of a case, the court should determine whether the improperly admitted evidence more probably than not prejudiced the jury in its verdict and thereby unfairly tainted the decision-making process.

---

[6](...continued)

> It may be true that we are never able to see into the heart of any man, but of course the law of evidence routinely supposes that inferences about motivations, thoughts, and the like may be drawn and that the behavior of human beings may be predicted. . . . [I]f the record shows little or nothing about the jurors in the case, the appellate court should probably assume that the jury in question was a "typical" jury and would have reacted in a fashion typical of such a jury.

I John H. Wigmore, *Evidence* § 21 (Tillers rev. 1983).

-18-

The three-member panel of the Court of Appeals agreed that evidence regarding the Blair will and Ms. Caraway's real property holdings was irrelevant, but the majority concluded that the admission of such evidence was harmless. Judge Susano disagreed, concluding as follows:

> In this close case, the jury pitched a "shutout"—everything for the sons and nothing for Ms. Caraway. Under the circumstances, I cannot help but believe that the jury, at least in part, concluded (1) that Ms. Caraway was a "gold digger" who did not need the estate of the deceased and (2) that, in securing the deceased's signature on a will, she had repeated a "trick" that she had refined when she persuaded her mother to execute a will favorable to Ms. Caraway and against the interests of some of her kin. In other words, I believe the sons of the deceased were successful in their efforts to severely prejudice the position of Ms. Caraway with irrelevant evidence.

*Smallman*, 2011 WL 6144365 at *13 (Susano, J., dissenting) (footnote omitted). We agree with Judge Susano's conclusions.

From our review of the record, the facts presented a close case for the jury. It is apparent that the Smallman sons intended for the jury to view Ms. Caraway as a wealthy woman who was intent on acquiring their father's estate through manipulation and subterfuge just, as they insinuate, she had acquired the estate of her mother. Although the Blair will did not establish such a common scheme or plan, its introduction more probably than not was sufficient to mislead the jury to that unsubstantiated conclusion. Further, the evidence that Ms. Caraway was the sole beneficiary of her mother's estate under the Blair will and the holder of real estate with a total purchase price in excess of $1,800,000 more probably than not prejudiced the jury against Ms. Caraway, compelling the conclusion that because of her wealth, she did not need Mr. Smallman's estate and instead his two sons should inherit it. While no proof was presented as to the value of the estate Ms. Caraway received under the Blair will, the fact that she was the sole beneficiary could have implied to the jury that she received a substantial inheritance. The Smallman sons' intention in introducing this evidence is apparent from statements made by their attorney several times during the trial, charging that Ms. Caraway was "playing with house money"[7] and had nothing to lose by

---

[7] Counsel's "playing with house money" analogy is inapt — "playing with house money" is a phrase used in the context of casino gambling. It refers to a player who is staking money won from the casino and therefore, is not risking any of the money with which he or she came into the game. That would be the
(continued...)

-19-

seeking to gain Mr. Smallman's estate. In this regard, counsel for the Smallman sons stated in opening argument "basically, what we're dealing with in her mind, it's a million-dollar lottery; and she's playing with house money. She's got not one thing to lose. She can either get it all, and it costs her nothing. It costs her nothing to try." Again, in questioning Ms. Caraway about her mother's will, counsel for the Smallman sons asked Ms. Caraway, "Now, it's fair to say that you're basically – to use a term I think we can all understand – you're playing with house money here, aren't you? You don't have anything to lose in coming here today and trying to get a million dollars, do you?" Finally, in closing argument, counsel stated as follows:

> I asked Mrs. Caraway, I said, "You don't have anything to loose [sic]." And she got upset when I asked her that question. Let's think about it. What did she have to lose? She either gains $950,000; or she says she's out some attorney's fees. So she's got nothing to lose to just try to pull this sham off."

The Blair will was presented for the purpose of portraying Ms. Caraway as a bad person—"a gold-digger" who had engaged in the same activity before as a wealthy woman who did not need any more money. *Estate of Smallman*, 2011 WL 6144365, at *13 (Susano, J., dissenting). This evidence more probably than not prejudiced the jury to that conclusion. Our careful consideration of the record as a whole also confirms that more probably than not the jury was substantially swayed by the improperly admitted evidence such that the jury's verdict was so tainted as to warrant reversal and a new trial.

In determining that the jury's verdict was tainted by the improperly admitted evidence, it is necessary and appropriate that we consider the entire record and not just the issues specifically raised on appeal. First, we consider the proof presented as to whether the marriage should be ruled invalid because Mr. Smallman was without the requisite mental capacity to marry at the time of the marriage. While a regularly solemnized marriage is presumed valid, that presumption is rebuttable upon presentation of "cogent and convincing evidence" otherwise. *Guzman v. Alvares*, 205 S.W.3d 375, 380 (Tenn. 2006). The "cogent and convincing" standard of proof and the "clear and convincing" standard are the same. *See Louis Dreyfus Corp. v. Huddleston*, 933 S.W.2d 460, 467 n.5 (Tenn. Ct. App. 1996) ("The

---

[7](...continued)
situation here if Ms. Caraway were paying attorney fees to defend her alleged rights to Mr. Smallman's estate with money from the estate, but Ms. Caraway does not yet have any money from the Smallman estate. Hence, the phrase is not applicable. Nevertheless, the phrase also indicates that Ms. Caraway does not need the money from the Smallman estate and, in that sense, it accentuated the irrelevant evidence of her financial status.

'clear and cogent' standard is essentially similar to the 'clear and convincing' standard."). Clear and convincing evidence is evidence establishing that the facts asserted are highly probable; it is evidence that leaves "'no serious or substantial doubt about the correctness of the conclusions drawn'" therefrom. *Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 341 (Tenn. 2005) (quoting *Hodges*, 833 S.W.2d at 901 n.3). Like any other civil contract, a marriage may be voided "for want of sufficient mental capacity." *Cole v. Cole*, 37 Tenn. (5 Sneed) 57 (1857). Accordingly, a party may be found incapable of contracting to marry for want of mental capacity where it is shown by clear and convincing proof that at the time of the marriage ceremony, such party did not understand the special nature of the marriage contract and the rights and obligations it creates and therefore, did not freely and intelligently consent to the marriage. *See Nave v. Nave*, 173 S.W.3d 766, 774 (Tenn. Ct. App. 2005). It is the degree of mental incapacity at the exact time of the marriage that controls as to its validity, and consequently the party's mental condition before or after the ceremony is generally immaterial, "except insofar as it may be evidential of the mental incapacity of the party at the time the alleged contract was made." 55 C.J.S. *Marriage* § 15 (2009) (footnotes omitted). Although it is the party's mental capacity precisely at the time of the wedding ceremony that is the proper focus of inquiry, in the absence of indisputable evidence that the party was mentally competent at the time of the ceremony, a jury might, of course, reasonably infer mental incapacity based on evidence of a party's mental condition in close temporal proximity to the ceremony. *See Conaway v. N.Y. Life Ins. Co.*, 102 S.W.2d 66, 68 (Tenn. 1937) ("[I]t is the province of the jury not only to determine what are the proven facts, but what are the legitimate inferences to be drawn therefrom."). In sum, the Smallman sons had the burden of presenting clear and convincing evidence from which it could at least be reasonably inferred that their father lacked the mental capacity to marry Ms. Caraway on June 24, 2009. Our review of the evidence shows that properly admitted evidence in this case failed to meet the clear and convincing standard, and more probably than not the jury was strongly prejudiced by the irrelevant and improperly admitted evidence discussed above.

We begin by considering the testimony of Mark Smallman. Mark testified that he saw his father every other day in 2009. He testified regarding Mr. Smallman's ledger book, stating "we always called it 'Dad's Bible'" and that Mr. Smallman "wrote in it every day . . . . [E]very little thing he bought and sold was in this book. Every last penny was in this book." The ledger book shows multiple entries on each page and reflects accounting activity as to a variety of financial matters beginning in January 1991. Mark testified that after January 2009, a diminishing number of entries were recorded and a deterioration in the quality of Mr. Smallman's handwriting was observable. By May 2009, there are very few entries and no entries after that month. The Smallman sons apparently rely on the diminishing ledger book activity as proof that their father's mental condition was progressively deteriorating and that by June 2009, he no longer possessed the mental capacity

-21-

required to enter into a valid marriage contract. However, while the failure to enter information in a ledger book *may* be consistent with mental decline, it does not constitute clear and convincing evidence of such. On cross-examination, Mark agreed that his father's prognosis after March 2009 was not good and that it would not be unusual for a man who has terminal cancer to lose interest in keeping his ledger book. As further proof of Mr. Smallman's incapacity to marry, Mark recounted an incident involving Mr. Smallman and Mark's son, Steven. Mark testified that Mr. Smallman loved the military, and was proud that Steven had joined the Navy after high school. Mark stated that Mr. Smallman had taken great interest when Steven had come home for Christmas 2008. However, when Steven, wearing his uniform, next visited his grandfather on June 29, 2009, five days after the wedding, Mr. Smallman merely said "in a real low voice 'he looks good' and that was it." This testimony as to Mr. Smallman's apparently muted reaction to a visit from his grandson certainly does not rise to the level of clear and convincing evidence of mental incapacity to enter into a marriage contract. Finally, while Mark also specifically testified that his father was "not in his right mind" when he married Ms. Caraway, he did not explain what led him to that conclusion. When asked what he did to find out if Mr. Smallman was "in his right mind" on the day of the wedding, Mark stated that he "didn't do anything."

Jeffrey Smallman testified that when he visited his father in April 2009, he knew his father was declining, and that, in his opinion, his father was not mentally competent. When Jeffrey returned for another visit at the end of May 2009, Mr. Smallman had gotten worse, had lost more weight, and was not eating or drinking. Jeffrey testified that on this latter visit, Mr. Smallman asked Jeffrey to take him to the pawn shop. During the hour they were there, several people gave Mr. Smallman envelopes containing money, and that when Jeffrey and his father returned to Mr. Smallman's residence, Mr. Smallman "started going through his pockets and starts putting all this money – like 'What's this for?' He didn't know what all these payments were for." Standing alone, Mr. Smallman's question regarding the payments is ambiguous, and its import is unclear, it never having been established at trial what the payments *were* for and whether Mr. Smallman should have known what they represented. In any event, Mr. Smallman's expression of confusion regarding the nature of the payments he received that day in May 2009 does not constitute clear and convincing evidence that he was not competent several weeks later to marry Ms. Caraway. Jeffrey also testified that three days before the wedding, he called his father on Father's Day 2009. Jeffrey had sent Mr. Smallman a new ledger book as a present and asked Mr. Smallman if he had received it. Jeffrey testified that Mr. Smallman indicated that he wasn't aware that Jeffrey had sent the book and that he said something else that Jeffrey didn't understand. Again, this testimony does not constitute clear and convincing evidence of mental incapacity.

The Smallman sons also presented the testimony of Mr. Smallman's lifelong friend, Robert Darnell, and his wife, Teresa, to establish Mr. Smallman's mental incapacity at the

time of the marriage. Mr. Darnell stated that he visited Mr. Smallman occasionally and that he last saw Mr. Smallman on the evening of June 23, 2009, after Ms. Caraway called and requested that he come over. Mr. Darnell attested that Mr. Smallman was "pretty much" bedridden at the time, that Mr. Smallman's voice was "very, very weak" and that he could not understand what little Mr. Smallman said. It is not disputed that Mr. Smallman was physically debilitated and the fact that his voice was weak and he was difficult to understand is not proof that he was mentally incapacitated. Mr. Darnell's testimony does not imply that Mr. Smallman was difficult to understand because he was irrational. Belying that implication, Mr. Darnell testified that he "didn't want [Mr. Smallman] to have to repeat anything," indicating that Mr. Darnell could not understand what Mr. Smallman said because he could not hear him, not because Mr. Smallman was being nonsensical. Finally, Mr. Darnell testified that, in his opinion, Mr. Smallman could not have participated without assistance in a wedding ceremony. This testimony does not show that Mr. Smallman lacked the mental capacity to enter into a marriage contract and when considered in the context of Mr. Darnell's other testimony, only shows that Mr. Smallman would have required physical assistance to get through the ceremony. Ms. Darnell, who accompanied her husband on his visit with Mr. Smallman on June 23, 2009, testified that Mr. Smallman was gasping for breath during the visit and that she was unable to really communicate with him. Ms. Darnell's testimony, like her husband's, does not indicate that Mr. Smallman was mentally infirm.

Finally, on the issue of Mr. Smallman's mental capacity to marry, the Smallman sons offered the testimony of an employee at Mr. Smallman's pawn shop, Mr. Johnson, and of Mr. Smallman's business partner, Peter Balzano. Mr. Johnson stated that he noticed a decline in Mr. Smallman's mental health after he was diagnosed with lung cancer, that he "was having a problem understanding things," and that one day, Mr. Smallman was looking for his ledger book and could not find it. This rather vague and nonspecific testimony does not eliminate serious or substantial doubt as to whether Mr. Smallman was mentally incapable of understanding and entering into the marriage contract. Mr. Balzano testified that in early March 2009, Mr. Smallman, who Mr. Balzano described as "meticulous," allowed the pawn shop's Federal Firearms License to lapse for a couple of days. Mr. Balzano also stated that he observed a mental decline in Mr. Smallman when he visited the shop with Jeffrey, presumably in late May 2009. Neither of these observations constitutes evidence from which a jury could reasonably infer that on June 24, 2009, Mr. Smallman was so mentally incapacitated that he could not have knowingly entered into a marriage. When asked about Mr. Smallman's condition when Mr. Balzano visited him three days before the marriage, Mr. Balzano merely responded that Mr. Smallman was bedridden, that "he couldn't talk well"—that it was a "struggle for him to communicate"— and that in his opinion, Mr. Smallman could not have participated in a marriage ceremony at that time. Significantly, Mr.

Balzano did not testify that he observed Mr. Smallman to be suffering from mental incompetence on that date.

Countering the sparse proof presented by the Smallman sons as to Mr. Smallman's mental status when he married Ms. Caraway, Ms. Caraway submitted the following evidence in support of her assertion that Mr. Smallman was lucid and well aware of what he was doing when he married Ms. Caraway.

Mr. Smallman's first cousin, Betty Collins, witnessed the wedding and testified that, in her opinion, Mr. Smallman wanted to marry Ms. Caraway, knew what he was doing, and was not suffering from any mental decline. Ms. Collins observed that on the day of the ceremony, Mr. Smallman was declining physically and his voice was weak. She did not, however, associate Mr. Smallman's physical condition with any lack of understanding and recalled that he responded affirmatively during the wedding vows.

Attorney Bill Foutch testified that he represented Mr. Smallman as a creditor in a bankruptcy proceeding filed shortly before the wedding. Mr. Smallman held a deed of trust and note on real property owned by the debtors and when Mr. Smallman began foreclosing on the property, the owners filed a Chapter 13 bankruptcy petition. Mr. Foutch stated that he explained to Mr. Smallman the distinction between a Chapter 13 and a Chapter 7 bankruptcy and that Mr. Smallman was able to comprehend his explanation and made comments consistent with an accurate understanding of his explanation. Mr. Foutch further stated that on the day of the wedding, Mr. Smallman signed a proof of claim for filing in the bankruptcy case, that he and Mr. Smallman had discussed the claim just a week or ten days before that, and that Mr. Smallman was able to convey information necessary to complete the claim pertaining to both the underlying note and tax and insurance payments that he had made on the property. Mr. Foutch also testified that on the day of the wedding ceremony, he went to Mr. Smallman's residence to execute the affidavit for the marriage license and that after passing pleasantries with Mr. Smallman, he asked Mr. Smallman if he knew why he was there and that Mr. Smallman answered, "Yeah, to seal the deal." When Mr. Foutch asked Mr. Smallman what he meant by "sealing the deal," Mr. Smallman responded, "Being man and wife." Mr. Smallman signed the affidavit in Mr. Foutch's presence, and Mr. Foutch concluded that Mr. Smallman understood what he was doing when he did so and knew what he was doing when he married Ms. Caraway.

Ross Carmack, who performed the wedding ceremony, testified that Mr. Smallman originally told him that he wanted to marry Ms. Caraway eighteen months before the wedding and that even after his second round of chemotherapy, Mr. Smallman had continued to express his desire to marry her. Mr. Carmack stated that on the day of the wedding, he had a private conversation with Mr. Smallman, and Mr. Smallman told him that he wanted to

marry Ms. Caraway. Mr. Carmack testified that even though Mr. Smallman was physically ill and his voice was weak, on the day of the wedding Mr. Smallman was "very alert mentally," that he knew what he was doing when he married Ms. Caraway, and that it was what he wanted to do.

The Smallman sons' assertion that Mr. Smallman was not mentally competent to enter into his marriage to Ms. Caraway was contradicted by the testimony of James H. Gose, with whom Mr. Smallman had gone to high school and with whom he owned rental property. Mr. Gose testified that four or five days before Mr. Smallman died, the two of them were discussing a plumbing problem in one of the apartments they owned, that Mr. Smallman was concerned and asking questions, and that he never felt that Mr. Smallman was mentally incapable of discussing matters with him. Finally, Ms. Caraway testified that Mr. Smallman wanted to marry her, that they loved each other, and that on the day of the ceremony he knew what he was doing.

Viewing the record as a whole, it is clear that the Smallman sons presented little, if any, proof from which a jury could have reasonably inferred that Mr. Smallman was not mentally competent to marry Ms. Caraway on June 24, 2009. Certainly, what proof they offered did not amount to clear and convincing evidence. Ms. Caraway, on the other hand, presented evidence that on the day of the wedding Mr. Smallman was mentally competent and fully aware of what he was doing. It is apparent that more probably than not the jury was so prejudiced against Ms. Caraway by the admission of the irrelevant evidence regarding the Blair will and Ms. Caraway's real property holdings that it found against her on the issue of Mr. Smallman's capacity to marry despite the absence of supporting relevant evidence.

The jury also found that Mr. Smallman was not of sound mind when he executed the will of April 16, 2009. After careful review of the record, we conclude that as to this issue also, the evidence was insufficient to support a verdict in favor of the Smallman sons and, rather, preponderates in favor of Ms. Caraway. It is apparent that the jury more probably than not was prejudiced by the admission of the irrelevant evidence of the Blair will and Ms. Caraway's real property holdings in finding against Ms. Caraway on this issue.

A will may be challenged on the theory that at the time of the will's execution the testator lacked sufficient mental capacity:

> The law requires that the testator's mind, at the time the will is executed, must be sufficiently sound to enable him or her to know and understand the force and consequence of the act of making the will. The testator must have an intelligent consciousness of the nature and effect of the act, a knowledge

of the property possessed and an understanding of the disposition to be made. While evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing.

*In re Estate of Elam*, 738 S.W.2d 169, 171 (Tenn. 1987) (citations omitted).

If a testator is sick and infirm, as was Mr. Smallman in April 2009, the proponent of the will bears the burden of showing by a preponderance of the evidence that the testator had testamentary capacity at the time of execution. *Street v. Waddell*, 3 S.W.3d 504, 506 (Tenn. Ct. App. 1999). A lesser degree of mental capacity is required to execute a will than is required to execute a contract, *Owen v. Summers*, 97 S.W.3d 114, 125 (Tenn. Ct. App. 2001), and we have concluded that Mr. Smallman had sufficient mental capacity to enter into a valid marriage contract on June 24, 2009, over two months after he executed the April 16, 2009 will. It is, however, the time of the will's execution that is the proper point of focus in assessing testamentary capacity. While proof of a testator's mental capacity "before and after making the will, if not too remote in point of time may be received as bearing upon that question [of testamentary capacity,]" "the mental condition of the testator at the very time of executing the will is the only point of inquiry." *Estate of Elam*, 738 S.W.2d at 172 (quoting *Am. Trust & Banking Co. v. Williams*, 225 S.W.2d 79, 84 (Tenn. Ct. App. 1948)). We recognize the possibility that mental capacity may fluctuate in an individual who is debilitated and terminally ill. But we will not assume that Mr. Smallman knew and understood "the force and consequence of the act of making [his] will" at the time of its execution on the basis of evidence that he later had the mental capacity required to enter into a marriage contract. We note that a lay witness's opinion is admissible on the issue of testamentary capacity if "based on details of conversations, appearances, conduct or other particular facts from which the [testator's] state of mind may be judged." *Estate of Elam*, 738 S.W.2d at 172.

Ms. Caraway presented the following unrebutted testimony of attorney Clinton Anderson to show that, on April 16, 2009, Mr. Smallman possessed the mental capacity necessary to execute his will. First, Mr. Anderson's testimony shows that Mr. Smallman gave precise, detailed instructions as to how the will should be drafted:

Q. [E]xplain the process you went through in preparing [Mr. Smallman's] will.

A. . . . [Mr. Smallman] told me what he wanted. . . . He told me that I should list in here some people that owed him some money so that when he was gone, his executors would know that. He also let me know that he was very ill. . . . He actually went into quite a bit of detail without my having to question him too much. I usually have to question people to get this kind of detail out; but I did not him, he was very intelligent and very business-like.

Mr. Anderson further testified that, in preparing a will for a client, he endeavors to determine the client's competency by asking the client questions about the past and present, and the client's health and property. He then asks the client how he or she wants the property disposed of, stating "I pay close attention to that because you have to know not only if they understand the nature and extent of their property but whether or not they have enough sense to know who they want their beneficiaries to be and why." Mr. Anderson testified as follows that he specifically sought to ascertain Mr. Smallman's testamentary capacity on April 16, 2009:

Q. Did you talk with Mr. Smallman to ascertain certain things about his mental competency?

A. I did. . . . I asked him some questions about the size of his estate and what sort of things he had in it, and I asked him what he wanted to do, of course. Since almost everything he was leaving to Linda Caraway, I didn't have to go into much detail about what property he owned; but he answered very readily and succinctly and clearly and knew what he wanted to do. I was a little worried that he wasn't leaving anything to his sons; so, I questioned him about that. . . . I asked him why he wasn't leaving his sons anything, and he said he had already taken care of them with certificates of deposits and maybe accounts upon which he had their names.[8] And I concluded from his demeanor

_____

[8] John Brice testified that Mr. Smallman had named Mark and Jeffrey as equal beneficiaries under an annuity account with Sun Life Financial of Canada divisible at Mr. Smallman's death. Beth Boniface, the court appointed administrator of Mr. Smallman's estate, testified that the monies in this account, totaling approximately $158,000.00, were divided between the Smallman sons. Ms. Boniface also testified that Mr. Smallman had additionally provided for approximately one million dollars to pass to his grandchildren outside of the will.

> and his responses and his past history and from that answer that
> he knew what he was doing.

Mr. Anderson testified that when Mr. Smallman executed his will on April 16, 2009, Mr. Smallman knew and understood what he was doing, the extent of his property, and who would be the normal, expected objects of his bounty. In sum, Mr. Anderson concluded that he has "no doubt in [his] mind as to [Mr. Smallman's] mental capabilities or knowledge of his property on [April 16, 2009]" and that Mr. Smallman was competent to execute his will.

Mr. Anderson's testimony was corroborated by the testimony of his secretary, Sandra Hardy, who, along with Mr. Anderson, witnessed Mr. Smallman's will on April 16. She testified that she asked Mr. Smallman if he thought his sons would be angry that the will left everything to Ms. Caraway and he responded that "they shouldn't be because I've left their names on accounts." Ms. Hardy attested that on the day he executed the will, Mr. Smallman appeared to be competent, and appeared to understand what he was doing and to know about his property and about relatives and people who might be expected to be his heirs.

In addition to the testimony of attorney Anderson and his secretary, John Brice, an employee of SunTrust Investment Services, also testified he had known Mr. Smallman as a friend and client for more than ten years and testified that he talked with Mr. Smallman approximately one week before Mr. Smallman executed his will. At that time, he and Mr. Smallman conducted banking business requiring that Mr. Smallman sign documents to effect an account transfer. Mr. Brice stated that he "tried to take particular note of just how [Mr. Smallman] appeared and how his demeanor was that day," that he felt that Mr. Smallman was competent and noted Mr. Smallman's "quick, ready smile" and that "his signature appeared firm and compared virtually identically to any previous signatures." Although Mr. Brice observed that Mr. Smallman was in a weakened physical condition, he did not sense any depth of mental decline.

Finally, James Gose, who saw Mr. Smallman up until the time of his death testified that he never considered Mr. Smallman to be mentally incompetent.

Confronted with all this testimony, particularly the unrebutted testimony of attorney Anderson and his secretary, the Smallman sons failed to present any evidence showing that on April 16, 2009, Mr. Smallman lacked the required mental capacity to execute his will. They failed to prove that he did not know and understand the force and consequence of the act of making the will and that he did not have an intelligent consciousness of the nature and effect of the act, a knowledge of the property possessed and an understanding of the disposition to be made. *Cf. Estate of Elam*, 738 S.W.2d at 171. Accordingly, we conclude that, more probably than not, the jury was led to its verdict in favor of the Smallman

sons not on the basis of relevant probative evidence, but rather on the basis of the irrelevant and prejudicial evidence of the Blair will and Ms. Caraway's real property holdings.

The jury rendered a verdict in favor of the Smallman sons on the issue of Mr. Smallman's capacity to marry despite the absence of clear and convincing evidence in support of that verdict. The jury also rendered a verdict in favor of the Smallman sons on the issue of testamentary capacity although the evidence strongly preponderated in favor of Ms. Caraway on that issue. We also conclude that the inadmissible evidence of both the Blair will and Ms. Caraway's substantial real property holdings established the impression that Ms. Caraway was a wealthy woman who did not need Mr. Smallman's estate. This impression was emphasized by counsel's comments that Ms. Caraway was "playing with house money" and had nothing to lose. In sum, the erroneous admission of evidence pertaining to the Blair will and Ms. Caraway's real property holdings more probably than not affected the jury's verdict. Accordingly, the admission of such evidence was harmful and warrants reversal and a new trial.[9] *Gomez*, 367 S.W.3d at 249; Tenn. R. App. P. 36(b).

The final issue raised by Ms. Caraway as to whether there was material evidence to support the jury's verdict that the marriage was void is pretermitted by our conclusion that the jury's verdict should be reversed and this case remanded for new trial as a result of the admission of irrelevant and harmful evidence.

---

[9] The jury also concluded that the April 16, 2009 will was obtained through Ms. Caraway's undue influence and that the will should not be established and admitted to probate. We need not determine the harmful effect of the inadmissible evidence as to the jury's verdict on these two issues; our conclusion that the inadmissible evidence pertaining to Ms. Caraway's real estate holdings and the Blair will was harmful as to the issues of Mr. Smallman's capacity to marry and testamentary capacity suffices to show that a new trial is warranted in this case. On the issue of undue influence, however, we note that a jury may not properly consider the issue of undue influence where it has determined that the testator lacked testamentary capacity:

> [S]hould a jury in a case where both [the issue of testamentary capacity and the issue of undue influence] were present, find the deceased to be of unsound mind, the issue of undue influence is never reached. Undue influence presupposes a mind of testamentary capacity. Acts of insane minds or minds lacking testamentary capacity are void regardless of influence, undue or not.

*Parham v. Walker*, 568 S.W.2d 622, 624 (Tenn. Ct. App. 1978); *see also Keasler v. Estate of Keasler*, 973 S.W.2d 213, 219 (Tenn. Ct. App. 1997). Having found that Mr. Smallman was without testamentary capacity, the jury was precluded from also finding that his will was obtained through Ms. Caraway's undue influence.

## III. Conclusion

For the reasons stated herein, we hold that Ms. Caraway waived her argument that the Smallman sons were without standing to contest the validity of her marriage to Mr. Smallman. We further hold that the evidence regarding the Blair will and Ms. Caraway's real estate holdings was irrelevant and prejudicial and that its admission more probably than not affected the jury's verdict. Accordingly, we reverse the judgment of the trial court and remand for a new trial on all issues presented to the jury at the first trial.[10] Costs of this appeal are taxed to Mark and Jeffrey Smallman and their sureties, for which execution may issue if necessary.

_____
SHARON G. LEE, JUSTICE

---

[10] Because Ms. Caraway failed to raise the issue of standing with the trial court and we have held it waived, it is not available and should not be reconsidered upon remand. *See Melton v. Melton*, No. M2003-01420-COA-R10-CV, 2004 WL 63437, at *3 (Tenn. Ct. App. Jan. 13, 2004); *Davis v. Estate of Flynn*, E2001-02480-COA-R3-CV, 2002 WL 31174229, at *8-9 (Tenn. Ct. App. Sept. 30, 2012).