# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
June 23, 2020 Session

# HUDSON, HOLEYFIELD & BANKS, G.P. v. MNR HOSPITALITY, LLC

**Appeal from the Chancery Court for Shelby County**
**No. CH-14-1203-3   JoeDae L. Jenkins, Chancellor**

———————————————————

## No. W2019-00123-COA-R3-CV

———————————————————

This case involves a lease that allowed a restaurant to operate inside a hotel building. During the term of the lease, the original owner-lessor sold the hotel building to a successor, who then sold the hotel building to the appellant. The appellant tried to "buy out" the tenant and cancel the lease, but the tenant refused. The appellant proceeded with demolition of the interior of the hotel. Thereafter, the tenant experienced a series of problems with the building, including major water leaks, lack of climate control, and other problems, which led the tenant to file this lawsuit. After a three-day bench trial, the trial court concluded that the appellant maintained the premises in an uninhabitable state, amounting to a constructive eviction of the tenant. The trial court found that the appellant repeatedly and intentionally disturbed the tenant's quiet enjoyment of the premises through its failure to maintain climate control in the hotel, failure to maintain windows and doors in the building, and allowing the building to be closed by Shelby County Code Enforcement for approximately six months. It found that the appellant engaged in extreme, outrageous, and intentional conduct intended to destroy the tenant's business and drive the tenant to vacate the premises, constituting an unlawful ouster of the tenant and retaliatory eviction. The trial court calculated the tenant's lost profits for the remaining term of the lease at $595,025. Due to the extremity of the appellant's actions, the trial court also awarded the tenant punitive damages. On appeal, the appellant does not challenge the trial court's findings regarding liability on the underlying causes of action. It only challenges the calculation of the award of lost profits and the award of punitive damages. For the following reasons, we affirm the award of lost profits as modified but vacate and remand for further proceedings regarding punitive damages.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**
**in Part as Modified, Vacated in Part, and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and ARNOLD B. GOLDIN, J., joined.

William C. Sessions, III and Robert L. Hutton, Memphis, Tennessee, for the appellant, MNR Hospitality, LLC.

Derek E. Whitlock, Memphis, Tennessee, for the appellee, Hudson, Holeyfield & Banks, G.P. d/b/a Denny's Restaurant.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This case involves a Denny's Restaurant that operated inside the Benchmark Hotel on Union Avenue in downtown Memphis. The restaurant was owned and operated by a general partnership called Hudson, Holeyfield & Banks, G.P. ("HHB"). HHB entered into the lease agreement in 2001 with the original owner of the hotel. The original term of the lease was seven years (2001-2008), but the tenant was granted five additional three-year options. The Denny's Restaurant operated on the ground floor within the structural confines of the Benchmark Hotel. Chris Hudson was the chief executive officer of the HHB partnership and responsible for overseeing the day-to-day business of the Denny's Restaurant. In 2008, HHB notified the owner of the hotel that it intended to exercise the first three-year option to continue the lease.

According to HHB, the original owner-lessor transferred ownership of the hotel to a successor around 2008. The successor entity continued to operate the hotel for a couple of years but then decided to close the hotel for remodeling. In the process, the successor owner locked the door to the hotel lobby, which effectively prevented the patrons of Denny's from entering the restaurant through the lobby entrance. The lobby entrance was the only handicap accessible entrance to the restaurant, as the only remaining exterior entrance had a stairway. HHB filed suit and obtained an injunction requiring the current owner and its "successors and assigns" to provide unfettered access to the restaurant through the handicap entrance within the hotel. In 2011, HHB notified the successor owner that it intended to exercise its second option under the lease and extend the term for an additional three years.

In December 2012, the hotel was sold to MNR Hospitality, LLC ("Defendant") for $3.2 million. In April 2013, Defendant sent a letter to Mr. Hudson (CEO of HHB). The letter stated that unless they were able to cancel the Denny's lease, Defendant would be forced to sell the hotel because it had been unable to locate a major hotel franchise that would accept a Denny's Restaurant. In an "attempt to salvage what ha[d] turned out to be a bad deal," Defendant offered HHB $100,000 to cancel the lease. HHB declined the offer and informed Defendant that it had every intention of honoring the lease going forward and expected Defendant to do the same.

Thereafter, Defendant proceeded with "soft demolition" of the hotel interior to allow engineers and other individuals to "see the structure of the hotel." Defendant did not obtain any permits for the work. Furniture and plumbing fixtures were removed, and some of the hotel windows were removed to facilitate the removal of items. Water leaks began to occur within the Denny's Restaurant around the fall of 2013. The leaks continued on a regular basis and became more severe. Mr. Hudson was unable to seat patrons in certain areas of the restaurant because of the severity of the leaks. HHB notified Defendant about the leaks and also complained about problems with the climate control in the building. In January 2014, HHB was forced to shut down the restaurant entirely due to major water damage from a burst pipe. Mr. Hudson was of the understanding that the pipe burst due to the lack of climate control in the building. Defendant claimed it was sufficiently heating the hotel by turning on the heating units inside the individual hotel rooms and opening the hotel room doors. The restaurant was closed for some time due to the water damage but reopened within sixty days. HHB filed an insurance claim and recovered for the loss of its inventory and other damages.

Around this time, HHB notified Defendant that it intended to exercise its third lease option for an additional three-year term, from 2014 to 2017. However, in its notice letter, HHB complained about the air conditioning and ventilation system and the safety of the handicap entrance through the hotel lobby. HHB stated that the entrance was "in serious disrepair and crumbling." Mr. Hudson also complained about "vagrants" sitting near the restaurant entrance in the vacant hotel lobby because he feared that they would harass or threaten customers. HHB continued to experience additional water leaks throughout 2014. On five to six occasions, Mr. Hudson was forced to close down one side of the restaurant.

In August 2014, HHB filed this lawsuit against Defendant for specific performance, breach of contract, unlawful ouster, retaliatory eviction, and tortious interference with peaceful and quiet possession. HHB sought compensatory and punitive damages. It also sought injunctive relief prohibiting Defendant from violating the lease or disrupting services. Defendant filed a counterclaim alleging that HHB breached the lease.

In December 2014, Denny's experienced another major flood, which caused ceiling tiles to fall. Mr. Hudson called the local code department, and "they came down and shut down the water." The entire restaurant was closed again. After an inspection, a county plumbing inspector informed Mr. Hudson that the building was not safe, and a citation was placed on the restaurant door. The plumbing inspector found a number of code violations throughout the building and determined that it could not be occupied. There were open uncapped sewer lines where fixtures had been removed, creating a hazardous condition. The inspector observed that someone had been living in one area and had attempted to tie on to the water supply with illegal connections that could have resulted in contamination. The citation stated that tenants could not occupy the building.

During this shutdown, the restaurant was closed for around six months while awaiting the resolution of the citation. HHB filed another insurance claim and received payment for its damages due to this second major flood. While the restaurant remained closed, unbeknownst to HHB, Defendant requested revised plans from its architectural firm showing no Denny's Restaurant present in the building plan and determining alternative uses of that space.

HHB learned in mid-June that the citation and problems at the building had finally been remedied. However, when it started its plans to reopen, the Denny's franchisor informed HHB that it would require HHB to go through a recertification process before re-opening because the restaurant had been closed for so many months. Although it explored loan options, HHB was unable to afford this additional cost of around $100,000 to reopen the restaurant. HHB began removing equipment from the restaurant during the latter part of 2015. Before it completed the process, Defendant re-entered the premises and changed the locks. Defendant sent a letter to HHB stating that it deemed the lease terminated based on abandonment. Thereafter, while this litigation remained pending, the Shelby County Environmental Court declared the building a public nuisance.

This case was tried over the course of three non-consecutive days in 2018. The trial court heard testimony from Mr. Hudson; Frank Banks, a second partner in HHB who was a certified public accountant and oversaw its finances; two plumbing inspectors from Shelby County Code Enforcement; a contractor employed by Defendant; a plumber who performed work at the hotel approximately fifteen times; the sole owner of the Defendant LLC; and Defendant's asset manager who oversaw development of the hotel. By the time of trial, Defendant had entered into a franchise agreement with Marriott Hotels, the same franchise that had initially refused Defendant's location because of the presence of the Denny's Restaurant. Defendant had also executed a contract to sell the hotel for a price of $7 million. At the conclusion of the testimony, without hearing closing argument, the trial judge ordered the parties to attend mediation.

When mediation proved unsuccessful, the trial court entered a 28-page written order ruling in favor of HHB on all claims. Regarding the counterclaim for breach of the lease, the trial court found that Defendant provided no proof of any breach by HHB. However, it found "more than adequate evidence that [Defendant] acted intentionally to force HHB out of the Denny's premises due to [Defendant's] view that the mere presence of the Denny's prevented other avenues for profit." The court found that Defendant's actions demonstrated its "desire to be rid of the Denny's and its Lease with HHB." It found that Defendant willfully created conditions in the hotel that would disrupt HHB's quiet and peaceful enjoyment of the premises, such as removing climate control, not providing pest control, removing windows thereby leaving the building exposed to the elements, and failing to remedy code violations for five months, thereby shutting down the Denny's Restaurant and constituting unlawful ouster of HHB. It found that Defendant allowed the lobby entrance to fall into disrepair, with "missing tiles in the ceiling, debris from the above

- 4 -

vacant building falling into the area, hanging fixtures, and incomplete and unfinished walls," which attracted vagrants to sleep in the lobby. The court found that the state of disrepair and the regular flooding of the restaurant persisted for years after HHB informed Defendant of the issues. The trial court found that the citation regarding uncapped sewage lines rendered the building uninhabitable and amounted to constructive eviction of HHB. It found that Defendant's six-month delay in remedying the citation was unreasonable in light of the fact that the actual work took only five days once it commenced, and that Defendant "chose to wait" to complete the repairs that would have allowed the restaurant to reopen. It found that Defendant's actions were in retaliation for HHB's refusal to be bought out, constituting retaliatory eviction. The trial court also found that Defendant's changing of the locks without notice constituted wrongful eviction.

The trial court found that the proper measure of damages would include "the loss of net profits." It found that the lease was in its third option period when this lawsuit was filed and that the remaining option periods would extend through May 31, 2023. Based on the testimony of Mr. Banks regarding HHB's income statements, the trial court averaged the partnership's "net operating income" from 2010 to 2013 (the four years prior to 2014 when HHB experienced shutdowns due to leaks). The trial court found that HHB's average "net operating income" from 2010 to 2013 was $70,696 per year. The trial court found that Defendant constructively terminated the lease and denied access to the Denny's Restaurant from December 2014 forward. However, HHB did not seek to recover damages for 2014 or 2015 because of insurance recoveries. Thus, the trial court calculated HHB's "loss of future net operating income" from January 1, 2016, until May 31, 2023, at $595,025. Additionally, the trial court found that HHB was unable to recover a computer system from the Denny's Restaurant office when Defendant changed the locks, and it awarded $20,000 to HHB for the "actual loss" of the computer system converted by Defendant.

The court found that Defendant acted recklessly, intentionally, and knowingly, and it engaged in extreme, outrageous, and intentional conduct "intended to destroy HHB's business and drive HHB to vacate the Denny's." "Due to the extremity of [Defendant's] intentional acts and conduct over several years leading to the wrongful eviction and ouster of HHB," the court found that HHB was entitled to punitive damages "in the amount of two [times] (2x) the lost profits for a total award of One Million One Hundred Ninety Thousand Fifty Dollars ($1,190,050.00)." The trial court also awarded HHB $75,000 in attorney's fees pursuant to a provision in the lease. The trial court entered judgment on the damage award and dismissed the counterclaim asserted by Defendant. Defendant appealed to this Court.

## II.   ISSUES PRESENTED

On appeal, Defendant only challenges the trial court's damage awards. Defendant presents the following issues, which we have restated, for review:

- 5 -

1.      Whether the trial court erred in its calculation of lost profits by:
        (a)     utilizing the "net operating income" of HHB rather than its net profits,
        (b)     erroneously calculating the remaining lease period as eight years and five months rather than seven years and five months, and
        (c)     including data from 2013 when HHB received a refund from a utility company that materially increased the average.

2.      Whether the trial court erred by awarding punitive damages without bifurcating the proceedings, without affording Defendant an opportunity to present proof on the relevant factors, without making findings regarding the statutory factors, and without making its findings by clear and convincing evidence.

For the following reasons, we affirm the decision of the chancery court in part as modified, and we vacate in part and remand for further proceedings.

## III.   DISCUSSION

### A.     *Lost Profits*

At the outset, we note that Defendant does not challenge the trial court's decision to award lost profits as one component of HHB's compensatory damages.[1]   Defendant concedes that lost profits are recoverable but challenges the trial court's calculation of the *amount* of lost profits.  In a non-jury case such as this, an appellate court must affirm the trial court's damage award unless the trial court adopted the wrong measure of damages or the evidence preponderates against the amount of damages awarded.  *Wilson v. Monroe Cty.*, 411 S.W.3d 431, 443 (Tenn. Ct. App. 2013) (citing *Moody v. Lea*, 83 S.W.3d 745, 751 (Tenn. Ct. App. 2001)).

"In general, the *existence* of damages cannot be uncertain, speculative, or remote, but the *amount* of damages may be uncertain if the plaintiff lays a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages."  *Tennison Bros., Inc. v. Thomas*, 556 S.W.3d 697, 724 (Tenn. Ct. App. 2017) (citing *Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 10 (Tenn. 2008) *overruled on other grounds by Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235 (Tenn. 2015)).  "[T]he amount of future damages is necessarily speculative and imprecise to some degree."  *Id.* (quotation omitted).  As we explained in *Tennison*,

> "Once an injured party proves that it has been damaged, the amount of the damages need not be proved with certainty or mathematical precision."

---

[1] We also note that neither party challenges the award of compensatory damages for conversion of the computer system or the award of attorney's fees.

[*Waggoner Motors, Inc. v. Waverly Church of Christ*, 159 S.W.3d 42, 58 (Tenn. Ct. App. 2004)] (citing *McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 200 (Tenn. Ct. App. 1990)). The amount of lost profit damages awarded "may be based on estimates." *Id.* (citing *Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003); *Sostchin v. Doll Enters., Inc.*, 847 So.2d 1123, 1128 (Fla. Dist. Ct. App. 2003)). Of course, definite proof regarding the amount of damages is desirable as far as reasonably possible, but "it is even more desirable that an injured party not be deprived of compensation merely because it cannot prove the extent of the harm suffered with complete certainty." *Id.* (citing *Restatement (Second) of Torts* § 912 cmt. a (1979)).

*Id.* at 725.

"Since lost profits can rarely be computed down to the last penny, the evidence needed to support an award for lost profits need only provide a reasonable or rational basis for calculating what the lost profits would have been." *Waggoner Motors*, 159 S.W.3d at 59 (internal citations omitted). "The best evidence of lost profits is a comparison of the injured party's revenue and expenses before and after the wrongdoing." *Stainmaster Carpet & Restoration, LLC v. Music City Messenger Serv., Inc.*, No. M2018-01368-COA-R3-CV, 2019 WL 2714633, at *9 (Tenn. Ct. App. June 28, 2019) *perm. app. denied* (Tenn. Oct. 11, 2019) (citing *Waggoner Motors*, 159 S.W.3d at 59). "When the plaintiff is an established business with a consistent earnings history, the profit record from the most recent years can usually supply the requisite degree of certainty" to support an award of lost profits. *Forklift Sys., Inc. v. Werner Enterprises*, No. 01A01-9804-CH-00220, 1999 WL 326159, at *1 (Tenn. Ct. App. May 25, 1999). The injured party's anticipated future profits may be reasonably ascertained from its past volume of business and other provable data relevant to its probable future sales. *Waggoner Motors*, 159 S.W.3d at 59. It is important to note, however, that "[d]amages for lost profits must be based on net profits, not on gross revenues or on gross profits." *Id.* As such, persons seeking to recover for lost expected profits must prove not only their probable income "but also the expenses they would have incurred to produce that income." *Id.* "An award for lost profits damages depends on whether the evidence provides a satisfactory basis for *estimating* what the injured party's probable earnings *and* expenses would have been had the wrongdoing not occurred." *Id.* at 58-59 (emphasis added).

In the case at bar, HHB presented the testimony of one of its partners, Frank Banks. Mr. Banks was retired but had been a licensed certified public accountant for 45 years. His role was to oversee all of the accounting and finances of the partnership. Mr. Banks was familiar with the accounts and records of HHB and had prepared the partnership's income statements each year in accordance with his standard practice. The income statements that Mr. Banks had prepared for 2010 through 2014 were admitted as exhibits at trial. The income statement for each year listed the partnership's total revenues, costs, and expenses for each month and year. The income statement displayed two calculations that are at issue

for purposes of this appeal. From the partnership's total revenues (sales and other income), Mr. Banks had deducted over twenty categories of expenses (such as cost of sales, professional services, accounting fees, maintenance and repairs, office expenses, taxes, rent and utilities, salaries and wages, supplies and uniforms, equipment, insurance, etc.) to reach a total that was designated "Net Operating Income." Beneath that calculation, three additional categories of expenses were further deducted (employee benefit, interest expense, and extraordinary items) to reach a final figure designated "Net Income Before Depreciation."

Mr. Banks never specifically testified that one calculation or the other would constitute the partnership's "net profits." His actual testimony about the income statements was fairly brief. He testified that the "employee benefit" entry near the bottom reflected additional compensation that was paid to employees and managers, over and above the normal operating expenses, similar to a bonus. The income statements reflected around $30,000 in employee benefits each year. Mr. Banks said these amounts were paid to ensure that employee turnover was low. He said it would be fair to consider the employee bonuses as a discretionary expense that was not "necessary" for the operation of Denny's. He was also asked about a particular entry from December 2013 under "Other Income and Expenses," which reflected that Denny's received $35,000 in "Other Income" that month. Mr. Banks said this was "a refund from MLGW," its utility company. Most of the other questions asked of Mr. Banks pertained to the insurance claims and various entries from 2014, the year for which HHB did not seek damages.

The attorneys did not present any closing argument to the court, as the parties were ordered to mediation. When the trial court entered its written order months later, it calculated HHB's lost profits using the "Net Operating Income" figures for each year, which did not include the final deductions for employee benefits, interest expenses, and extraordinary items. On appeal, Defendant asserts that the trial court erred by "utiliz[ing] Net Operating Income, rather than the Net Income Before Depreciation to calculate lost profits, which makes a material difference, as the former compilation does not include all expenses fairly attributable to operating the business." Defendant complains that the trial court never explained "why the Court utilized the Net Operating Income compilation for los[t] profits rather than the Net Income Before Depreciation, which would include other employee benefit and interest expenses fairly attributable to the business." Defendant argues that "[i]f one uses the numbers for Net Income Before Depreciation to calculate net profit" instead, this "would result in a correct number." In conclusion, Defendant asks this Court to vacate the lost profit award and remand with instructions for the trial court to recalculate lost profits considering all expenses fairly attributable to the business.[2]

---

[2] We note that Defendant attempted to change course with its argument in its reply brief. Initially, it repeated its assertion that "[t]he Chancellor should have used Denny's data as to its Net Income Before Depreciation in calculating lost profits, as that number also includes interest expense and all employee expenses." Later, however, Defendant argued that "taking all of Mr. Banks['s] testimony as true, there is simply not enough proof in the record to establish damages, and thus Denny's has failed to meet its burden

Bearing in mind that the calculation of lost profits necessarily entails some uncertainty, rather than mathematical precision, we conclude that HHB's introduction of its income statements and the testimony of Mr. Banks "provided a sufficient foundation to allow the trier of fact to make a fair and reasonable assessment of damages." *Tennison*, 556 S.W.3d at 726. We agree with Defendant, however, that under the circumstances of this case, the trial court should have used HHB's data as to its "Net Income Before Depreciation" to calculate lost profits rather than "Net Operating Income." Again, "[d]amages for lost profits must be based on net profits, not on gross revenues or on gross profits." *Waggoner Motors*, 159 S.W.3d at 59. Net profits means gross profits minus the "costs necessary to achieve those gross profits." *Phillips Contractor's & Mgmt., LLC v. Stealth Grp., LLC*, No. E2006-01960-COA-R3-CV, 2007 WL 1373189, at *2 (Tenn. Ct. App. May 10, 2007); *First Tenn. Bank Nat. Ass'n v. Hurd Lock & Mfg. Co.*, C.A. No. 117, 1988 WL 86493, at *3 (Tenn. Ct. App. Aug. 19, 1988). *Black's Law Dictionary* defines "net profit" as "[t]otal sales revenue less the cost of the goods sold and all additional expenses." *Black's Law Dictionary* (11th ed. 2019). For instance, in a case involving the lost expected profits from a sale of goods, the expected net profit would equal "the expected revenue from the sale of the goods minus the cost of the goods sold minus all of the seller's expenses fairly attributable to the sale of the goods." *Waggoner Motors*, 159 S.W.3d at 59. We must consider not only the "probable income" but also "the expenses [the plaintiff] would have incurred to produce that income." *Id*.

The "Net Operating Income" data used by the trial court did not include HHB's expenses for its employee benefit program (roughly $30,000 per year), interest (around $20,000 per year), or other expenses. Those were expenses that HHB historically incurred to produce its income, and they were fairly attributable to its business.[3] As such, we conclude that the trial court should have utilized the lower "Net Income Before Depreciation" figures to estimate lost profits.

This Court and others have previously affirmed awards of lost profits based on an

---

of proof." Thus, in its reply brief, Defendant argued, for the first time, that the judgment for lost profits must be reversed due to a lack of proof. Because Defendant failed to sufficiently advance this argument in its initial brief, it cannot raise it for the first time in its reply brief. "'A reply brief is limited in scope to a rebuttal of the argument advanced in the appellee's brief. An appellant cannot abandon an argument advanced in his brief and advance a new argument to support an issue in the reply brief. Such a practice would be fundamentally unfair as the appellee may not respond to a reply brief.'" *Denver Area Meat Cutters & Employers Pension Plan v. Clayton*, 209 S.W.3d 584, 594 (Tenn. Ct. App. 2006) (quoting *Caruthers v. State,* 814 S.W.2d 64, 69 (Tenn. Crim. App. 1991)).

[3] HHB argues in its brief that it paid these bonuses "to incentivize employees who admirably suffered through insufferable work conditions" that were "imposed by [Defendant]," and to allow deductions for the bonuses would reward the wrongdoer. According to HHB, "it was [Defendant's] tortious conduct that necessitated those bonuses in the first place." However, the record simply does not support this assertion. The bonuses were paid in roughly the same amount each year dating back to at least 2010, before Defendant purchased the hotel in December 2012.

average of "net income." *See Poole v. Union Planters Bank, N.A.*, 337 S.W.3d 771, 789-90 (Tenn. Ct. App. 2010) (concluding that a calculation of lost profits based on monthly "average net income" was "a fair and reasonable assessment" of damages based on the record before the court, while acknowledging that evidence could have been submitted to support a different number); *see also Dep't of Transp. v. Martin*, 331 S.E.2d 45, 46 (Ga. Ct. App. 1985) (finding that evidence of "generated net income" for past years enabled the jury to estimate the amount of lost profits with reasonable certainty); *Benchmark Health Care Ctr., Inc. v. Cain*, 912 So. 2d 175, 180 (Miss. Ct. App. 2005) (finding sufficient evidence to estimate lost profits where the company's accountant calculated an "estimated net income per day" figure and multiplied it by the number of days left in the contract); *Eagle Oil & Gas Co. v. Shale Expl., LLC*, 549 S.W.3d 256, 275 (Tex. Ct. App. 2018) (stating that estimates of lost profits "must concern net income—income minus expenses"); *but see Forklift Sys., Inc. v. Werner Enterprises*, No. 01A01-9804-CH-00220, 1999 WL 326159, at *1–2 (Tenn. Ct. App. May 25, 1999) (finding it appropriate to calculate lost profits based on "average annual operating income" to avoid consideration of a one-time litigation settlement that was "completely unrelated" to the company's daily operations). As one author put it, "courts will not allow recovery for lost profits unless the plaintiff can prove a direct effect on net income -- the colloquial 'bottom line.'" Robert M. Lloyd, *Contract Damages in Tennessee*, 69 Tenn. L. Rev. 837, 879 (2002). "Traditionally, net income is shown as the last line in a business's income statement." *Id.* at 879 n.323 (citing David G. Oedel, *Deming, TQM and the Emerging Managerial Critique of Law Practice*, 37 Ariz. L. Rev. 1209, 1230 n.117 (1995)). The "bottom line" has become "synonymous with net income or net profit." *Id.*

Looking to the actual data presented at trial, HHB's income statements reflected the following calculations for each year:

|  | Net Operating Income | Net Income Before Depreciation[4] |
|---|---|---|
| 2010 | $73,363 | $13,902 |
| 2011 | $69,855 | $12,983 |
| 2012 | $55,066 | $4,465 |
| 2013 | $84,500 | $36,189 |

To calculate lost profits, the trial court averaged HHB's "Net Operating Income" and reached an annual average of $70,696. It should have used HHB's average "Net Income Before Depreciation," which was, by our calculation, $16,884.75.

The next issue raised by Defendant is whether the trial court miscalculated the remainder of the lease term by twelve months. According to Defendant, the trial court erroneously calculated eight years and five months remaining in the lease when the correct amount should have been seven years and five months. In its brief as appellee, HHB

---

[4] We note that neither party has raised any issue regarding depreciation.

concedes that this was a "clerical error" in the calculation. HHB suggests that the trial court may have "unintentionally included" one of the years for which it did not seek to recover because of insurance payments. Because HHB concedes that the trial court erred in its calculation, we agree with Defendant that the calculation of lost profits should be for a period of seven years and five months.

Finally, Defendant argues on appeal that the trial court "should have excluded the year 2013 in calculating historical net profits due to an anomaly." Defendant argues that HHB received a "one-time, large refund" from the utility company in December 2013 and that this "one aberrant year materially throws off the average calculation." Defendant compares the situation to an individual who "happened to win $1,000,000.00 from the Tennessee lottery" and would never receive such income again.

Notably, Defendant never argued at trial that the trial court should disregard the data from 2013. Furthermore, the record before us simply does not contain sufficient evidence about this "refund" to support Defendant's argument on appeal. Mr. Banks only testified that the $35,733 entry was for "a refund from MLGW." He said that the refund was attributable to previously paid expenses that would have been reflected in the "rent and utilities" category when paid to MLGW, and it "could have been" paid as an expense in 2012, but he was not certain. There was no testimony that this was a one-time refund, and the "Other Income/Expenses" category shows additional credits of varying amounts in January 2013 and in previous years. As noted by HHB on appeal, there is nothing in the record to show that this was a gratuitous benefit akin to winning the lottery or an anomaly. Instead, as HHB suggests, the original expense would have reduced profits in previous years, and the "refund" it was owed increased profits in 2013. We discern no reversible error in the use of data from 2013.

Utilizing HHB's average net income before depreciation of $16,884.75, for a period of seven years and five months, we calculate its lost net profits at $125,228.56. The trial court's award of lost profits is hereby affirmed as modified.

## B. *Punitive Damages*

We now turn to the award of punitive damages. HHB requested punitive damages in its complaint, but the issue of punitive damages was barely mentioned during the three-day trial. From our review of the record, the term "punitive damages" was only used once, when the attorneys were arguing a motion for involuntary dismissal at the close of the plaintiff's proof, and HHB's counsel briefly listed all of the claims in its complaint. When the trial court entered its written order, however, it awarded punitive damages to HHB due to the extremity of Defendant's actions and its reckless, intentional, and knowing conduct. However, the trial court did not specifically mention or analyze the statutory factors that are relevant to an award of punitive damages, and it never stated that it made any findings by clear and convincing evidence. Furthermore, the amount of punitive damages awarded

is unclear to this Court. The trial court's initial order stated that "HHB is entitled to punitive damages *in the amount of two (2x) the lost profits* for a total award of One Million One Hundred Ninety Thousand Fifty Dollars ($1,190,050.00) plus attorney fees in the amount of Seventy-Five Thousand Dollars ($75,000.00)." (emphasis added). Doubling the lost profit award would have equaled $1,190,050 for punitive damages alone ($595,025 x 2). However, the conclusion section of the order states, "The plaintiff sustained damages in the amount of *$1,190,050.00 for lost future earnings, actual damages, and punitive damages* and an attorney fee award of $75,000.00 for a *total* judgment of $1,265,050.00 as a result of the wrongful eviction and conversion." (emphasis added). A subsequent order added even more confusion, as it stated:

> IT IS THEREFORE ORDERED, ADJUDGED AND DECREED:
> 1. That the Plaintiff is awarded $1,265,050.00 in damages for lost earnings and punitive damages in the amount of two times (2x) the lost profits against MNR Hospitality, LLC . . . .
> 2. That the Plaintiff is awarded $20,000.00 in damages for the conversion of Plaintiff's personal property against MNR Hospitality, LLC . . . .
> 3. That the Plaintiff is awarded $75,000.00 in attorney's fees against MNR Hospitality, LLC . . . .

It would be necessary to remand the issue of punitive damages due to the lack of clarity regarding the amount awarded and the fact that we have modified the award of lost profits. However, that is not the only problem we perceive with respect to the award.

In *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn. 1992), the Tennessee Supreme Court set forth the following framework for awarding punitive damages:

> In a trial where punitive damages are sought, the court, upon motion of defendant, shall bifurcate the trial. During the first phase, the factfinder shall determine (1) liability for, and the amount of, compensatory damages and (2) liability for punitive damages in accordance with the standards announced above. During this phase, evidence of a defendant's financial affairs, financial condition, or net worth is not admissible.

> If the factfinder finds a defendant liable for punitive damages, the amount of such damages shall then be determined in an immediate, separate proceeding.

*Id.*

Tennessee Code Annotated section 29-39-104 now provides, in pertinent part:

(a) In a civil action in which punitive damages are sought:

- 12 -

(1) Punitive damages may only be awarded if the claimant proves by clear and convincing evidence that the defendant against whom punitive damages are sought acted maliciously, intentionally, fraudulently or recklessly;

(2) *In an action in which the claimant seeks an award of punitive damages, the trier of fact in a bifurcated proceeding* shall first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless and whether subdivision (a)(7) applies;

(3) If a jury finds that the defendant engaged in malicious, intentional, fraudulent, or reckless conduct, then the court shall promptly commence an evidentiary hearing in which the jury shall determine the amount of punitive damages, if any;

(4) In all cases involving an award of punitive damages, the trier of fact, in determining the amount of punitive damages, shall consider, to the extent relevant, the following: the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing; the impact of the defendant's conduct on the plaintiff; the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; the expense plaintiff has borne in attempts to recover the losses; whether the defendant profited from the activity, and if defendant did profit, whether the punitive award should be in excess of the profit in order to deter similar future behavior; whether, and the extent to which, defendant has been subjected to previous punitive damage awards based upon the same wrongful act; whether, once the misconduct became known to defendant, defendant took remedial action or attempted to make amends by offering a prompt and fair settlement for actual harm caused; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages. The trier of fact shall be instructed that the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole . . . .

Tenn. Code Ann. § 29-39-104(a)(1)-(4) (emphasis added). This statute was enacted in 2011 and supplanted the procedure for awarding punitive damages set forth in *Hodges*. *See* 8 *Tennessee Practice Series Pattern Jury Instructions Civil* 14.55A (2019 ed.).

Defendant argues that the statute now mandates a bifurcated proceeding when punitive damages are sought, even though *Hodges* only required bifurcation upon motion of the defendant. *See Hodges*, 833 S.W.2d at 901 ("In a trial where punitive damages are sought, the court, upon motion of defendant, shall bifurcate the trial.") Thus, Defendant argues that it expected the trial court to hold an additional proceeding regarding the amount

- 13 -

of punitive damages and that it did not present all of the evidence regarding the statutory factors that it otherwise would have.[5]

In response, HHB insists that the statute does not mandate a bifurcated proceeding. Because *Hodges* only required bifurcation on motion of the defendant, HHB suggests that the same rule should apply under the statute. HHB acknowledges that the statute broadly states, in subsection (2), "In an action in which the claimant seeks an award of punitive damages, *the trier of fact* in a bifurcated proceeding shall first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless . . . ." Tenn. Code Ann. § 29-39-104(a)(2) (emphasis added). However, HHB argues that subsection (3) narrows the scope of the statute by stating, "If *a jury* finds that the defendant engaged in malicious, intentional, fraudulent, or reckless conduct, then the court shall promptly commence an evidentiary hearing in which the jury shall determine the amount of punitive damages, if any." Tenn. Code Ann. § 29-39-104(a)(3) (emphasis added). Because subsection (3) only refers to a jury, HHB suggests that a separate hearing is only required in a jury trial. According to HHB, the statute is ambiguous as to whether a bifurcated proceeding is required in a bench trial. HHB points to several cases decided since the enactment of the statute in 2011 that have continued to state that bifurcation is required "upon motion" of the defendant.

We recognize that several cases since 2011 have stated that bifurcation is required "upon motion" of the defendant. *See, e.g.*, *Wilson v. Americare Sys., Inc.*, No. M2013-00690-COA-RM-CV, 2014 WL 791936, at *1 (Tenn. Ct. App. Feb. 25, 2014); *Massingille v. Vandagriff*, No. M2012-01259-COA-R3-CV, 2013 WL 5432893, at *5 n.8 (Tenn. Ct. App. Sept. 24, 2013); *McLemore ex rel. McLemore v. Elizabethton Med. Inv'rs, Ltd. P'ship*, 389 S.W.3d 764, 779 (Tenn. Ct. App. 2012). However, Tennessee Code Annotated section 29-39-104 took effect on October 1, 2011, and it only applied to "liability actions for injuries, deaths and losses . . . which accrue on or after such date." 2011 Tenn. Laws Pub. Ch. 510 (H.B. 2008). In each of the cases cited above, the statute was inapplicable due to the age of the case and was not applied by the courts. *See, e.g.*, *Wilson*, 2014 WL 791936, at *7 ("In this case, [] this Court is bound by the law existing prior to the 2011 enactment.").

Because of the relatively recent enactment of Tennessee Code Annotated section 29-39-104, it has been cited in only a handful of cases. From our research, the only Tennessee appellate court case applying Tennessee Code Annotated section 29-39-104 and also discussing the issue of bifurcation is *Overton v. Westgate Resorts, Ltd., L.P.*, No.

---

[5] During the phase of the trial pertaining to liability, proof of the defendant's financial condition or net worth is not admissible. *In re Estate of Smallman*, 398 S.W.3d 134, 151 (Tenn. 2013). However, in the bifurcated phase of the trial devoted to determining the *amount* of punitive damages, evidence of the defendant's financial condition is admissible. *Id.*

E2014-00303-COA-R3-CV, 2015 WL 399218, at *7 (Tenn. Ct. App. Jan. 30, 2015). In that case, this Court stated, "once a defendant has been found liable for punitive damages, the amount of such damages shall be determined in a separate proceeding." *Id.* (citing *Hodges,* 833 S.W.2d at 901). However, we cited *Hodges* for this statement rather than the statute.

Despite the lack of caselaw addressing the issue, several authors have opined that bifurcation is now mandatory pursuant to the statute. *See, e.g.*, Gary A. Cooper, *Tennessee Handbook Series, Tennessee Forms for Trial Practice – Damages* § 2:1 (2019) ("The *Hodges* decision provided that if a defendant moved for bifurcation, trial involving a claim for punitive damages would be bifurcated. The Tennessee Civil Justice Act of 2011 requires bifurcation of compensatory and punitive damages, without mention of any requirement that a defendant must move for such bifurcation."); *Id.* at § 2:2 ("Effective October 1, 2011, a motion for bifurcation of trial involving a claim for punitive damages is no longer required. The Act provides for bifurcation, without mention of the necessity of a motion."); Robert E. Burch, *Tennessee Handbook Series, Trial Handbook for Tennessee Lawyers* § 33:7 (2019) ("A trial in which punitive damages are sought shall be a bifurcated proceeding . . . ."); 8 *Tennessee Practice Series Pattern Jury Instructions Civil* 14.55A (2019 ed.) ("The statute requires bifurcation in Tenn. Code Ann. § 29-39-104(a)(2).").

We also note that when discussing the bifurcation procedure for awarding punitive damages prior to enactment of the statute, the Tennessee Supreme Court stated that "for the sake of consistency between jury trials and non-jury trials, the trial procedure should be the same in both types of cases." *Culbreath v. First Tenn. Bank Nat. Ass'n*, 44 S.W.3d 518, 529 (Tenn. 2001); *see also* Glynna K. Parde, *Torts--Hodges v. S.C. Toof & Co.: New Substantive & Procedural Changes in the Awarding of Punitive Damages in Tenn.*, 23 Mem. St. U. L. Rev. 239, 255-56 (1992) (suggesting that the bifurcation procedures set forth in *Hodges* "should be equally applicable to a trial judge as fact finder").

Returning to the language of the statute, it unequivocally states, "In an action in which the claimant seeks an award of punitive damages, *the trier of fact* in a bifurcated proceeding *shall* first determine whether compensatory damages are to be awarded and in what amount and by special verdict whether each defendant's conduct was malicious, intentional, fraudulent or reckless . . . ." Tenn. Code Ann. § 29-39-104(a)(2) (emphasis added). We conclude that this language is mandatory and that it applies to both jury trials and bench trials. Courts "presume that the General Assembly used every word deliberately and that each word has a specific meaning and purpose." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 527 (Tenn. 2010). Based on the plain language of the statute, we decline the invitation to read the statute as mandating bifurcation only in a jury trial and not in a bench trial.

We acknowledge that the General Assembly used the term "jury" in subsection

- 15 -

(a)(3), stating, "If a jury finds that the defendant engaged in malicious, intentional, fraudulent, or reckless conduct, then the court shall promptly commence an evidentiary hearing in which the jury shall determine the amount of punitive damages, if any[.]" Tenn. Code Ann. § 29-39-104(a)(3). However, we believe that this subsection requiring prompt action was likely intended to address concerns regarding whether a jury term might expire before a bifurcated proceeding could be completed. *See* Parde, 23 Mem. St. U. L. Rev. at 253 (explaining that in 1980, "Judge Drowota, writing for the Tennessee Court of Appeals, concluded that a split-trial procedure would make it nearly impossible to retain the same jury for both phases and that there will be 'no fair basis for the [punitive] award.' In an apparent attempt to address such a concern, Justice Drowota, in the *Hodges* decision, provided that 'the amount of damages shall be determined in an *immediate,* separate proceeding.'"); *see, e.g.*, *Larry E. Parrish, P.C. v. Strong*, No. M2017-02451-COA-R3-CV, 2018 WL 6843402, at *3 (Tenn. Ct. App. Dec. 28, 2018) (involving a situation in which twelve months expired since jurors were summoned for jury service and the bifurcated hearing as to the amount of punitive damages had not been completed, so a second jury determined the amount). Subsection (3) does not narrow the scope of subsection (2), as HHB suggests.

Because the trial court did not conduct a bifurcated hearing on the amount of punitive damages, we find it necessary to vacate the award of punitive damages and remand for further proceedings. We note that in some cases, appellate courts have affirmed the decision to *impose* punitive damages but remanded for additional proceedings or findings only with respect to the *amount*. *See, e.g.*, *Culbreath*, 44 S.W.3d at 528-29 (concluding that the trial court's findings of fact and conclusions of law amply supported the imposition of punitive damages but were not sufficient to support the amount of punitive damages awarded).[6] In this case, however, not only did the trial court fail to specifically mention any of the applicable factors, it did not make any of its findings by clear and convincing evidence. In the section of the order addressing punitive damages, the trial court stated, "There is *more than adequate evidence* that [Defendant] acted intentionally to force HHB out of the Denny's premises due to [Defendant's] view that the mere presence of the Denny's prevented other avenues for profit." (emphasis added). Unfortunately, however, the order never mentioned the clear and convincing evidence standard, so we cannot discern whether the trial court applied that standard when deciding to impose punitive

---

[6] In *Culbreath*, 44 S.W.3d at 528, the Supreme Court explained,

In jury cases the trial judge must review the jury's award of punitive damages and clearly set forth the reasons for decreasing or approving all punitive awards in findings of fact and conclusions of law demonstrating a consideration of all factors on which the jury is instructed. In non-jury trials, such as the pending case, the trial judge's findings of fact and conclusions of law are equally essential. In the absence of sufficient findings of fact and conclusions of law as to each of the relevant *Hodges* criteria, an appellate court cannot adequately review the trial court's award of punitive damages.

damages.[7] "The trial court's imposition of punitive damages requires a concurrent finding, by clear and convincing evidence, that the defendant acted intentionally, fraudulently, maliciously, or recklessly." *Clark v. Perry*, No. 02A01-9704-CH-00080, 1998 WL 34190562, at *7 (Tenn. Ct. App. Mar. 19, 1998) (citing *Hodges,* 833 S.W.2d at 901-02). "It is not enough that the Court finds the Defendant acts fraudulently or intentionally. Such determinations must be supported by 'clear and convincing evidence.'" *Barnett v. Lane*, 44 S.W.3d 924, 928 (Tenn. Ct. App. 2000). *See Cunningham v. Patterson*, No. W2000-01486-COA-R3-CV, 2001 WL 1683701, at *4 (Tenn. Ct. App. Dec. 31, 2001) ("Neither the oral ruling nor the written order states that intentional conduct had been proven by 'clear and convincing' evidence, which is necessary to support an award of punitive damages. Consequently, the trial court's award of punitive damages . . . must be reversed.").[8]

Because of the host of problems with the procedure employed and the lack of necessary findings, we deem it appropriate to vacate the award of punitive damages entirely. On remand, the proceedings should be conducted in two phases. First, the trial court should enter a revised order regarding its initial decision to *impose* punitive damages based on the evidence already presented at trial, clarifying whether it finds *by clear and convincing evidence* that Defendant acted intentionally, fraudulently, maliciously, or recklessly. If it does, the court must hold an additional hearing regarding the *amount* of punitive damages to be awarded, if any. Any additional order awarding punitive damages must address the statutory factors listed in Tennessee Code Annotated section 29-39-104.

## IV. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court in part as modified, we vacate in part, and we remand for further proceedings consistent with this opinion. Costs of this appeal are taxed equally to the appellant, MNR Hospitality, LLC, and to the appellee, Hudson, Holeyfield & Banks, G.P. d/b/a Denny's Restaurant, for which execution may issue if necessary.

---

[7] We emphasize that this is not a case where the trial judge simply failed to use the precise phrase "clear and convincing evidence." *See, e.g.*, *Davis v. Reliance Elec.*, 104 S.W.3d 57, 63 (Tenn. Ct. App. 2002) (acknowledging that an arbitrator failed to use "the magic language 'clear and convincing evidence'" in his memorandum opinion but noting that the language was used in the separate order and that it was otherwise "clear that the arbitrator found the evidence on this issue to be clear and convincing"). In this case, there is nothing at all in the order to indicate that the trial judge applied a heightened burden of proof.

[8] We note that the Court in *Cunningham* simply reversed the award of punitive damages. However, Defendant does not seek outright reversal in this case. In its brief, Defendant proposes that "this Court should vacate the award of punitive damages against [Defendant] and remand to the Chancellor to (1) determine whether [Defendant] acted intentionally or recklessly by clear and convincing evidence, (2) allow presentation of evidence of the specific statutory factors set forth in Tenn. Code Ann. § 29-39-104(a)(4); and if warranted then make specific findings of fact applying the statutory factors." We deem this remedy appropriate under the facts of this case.

_____

CARMA DENNIS McGEE, JUDGE